# United States Court of Appeals
## For the First Circuit

No. 21-1313

BRENDA BARNICA-LOPEZ; ASHLEY NICOLE LOPEZ-BARNICA,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Lynch, and Howard,
Circuit Judges.

Kevin P. MacMurray, Daniel T. Welch, and MacMurray &
Associates LLC on brief for petitioners.
Brian M. Boynton, Principal Deputy Assistant Attorney
General, Civil Division, U.S. Department of Justice, Anthony C.
Payne, Assistant Director, Office of Immigration Litigation, and
Alexander J. Lutz, Trial Attorney, Office of Immigration
Litigation, on brief for respondent.

February 8, 2023

**HOWARD**, **Circuit Judge**.  Petitioners Brenda Barnica-Lopez ("Barnica") and her daughter, Ashley Nicole Lopez-Barnica ("Ashley"), both natives and citizens of Honduras, petition for review of a final order of the Board of Immigration Appeals ("BIA"), which upheld an immigration judge's ("IJ") denial of their request for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  The agency denied their requests for asylum and withholding of removal based on a finding that they had failed to demonstrate a well-founded fear of future persecution "on account of" their membership in a protected social group consisting of their nuclear family.  Because we conclude that this finding is supported by substantial evidence and that the petitioners' CAT claim was not administratively exhausted, we deny the petition in part and otherwise dismiss it for lack of jurisdiction.

**I.**

From 2010 to 2013, Barnica and her long-time life partner and now husband, Leslie Rene Lopez ("Rene"), were engaged in business buying gold jewelry in Guatemala and reselling it for profit in Honduras.[1]  As part of this venture, Rene drove back and forth between Guatemala and Honduras two to three times per month

---

[1] We draw the relevant facts from the administrative record. See Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022).  This includes testimony before the IJ from Barnica and her husband, which the IJ found to be credible and corroborated.

to buy and transport the jewelry. He testified that he travelled the same route each time and was often accompanied by Barnica or other associates. For approximately two years, Rene completed these trips without incident.

While carrying a large amount of jewelry during one of these trips in June 2012, Rene and Barnica were closely followed by a truck for about 30 minutes. They eventually shook the tail, but the event left them frightened. Nevertheless, the couple continued the periodic trips to Guatemala over the next several months. In April 2013, however, a similar incident occurred that escalated into a violent attack involving gunfire and at least one of the attackers being shot and perhaps killed by one of Rene and Barnica's two traveling companions. Rene and Barnica reported this incident to two separate police agencies, at least one of which conducted an immediate if perhaps incomplete investigation.

Following this incident, Rene and Barnica discontinued their gold re-sale business, fearing that the attack was an attempted robbery and that any future trips to Guatemala would invite similar trouble. About one month later, Rene began receiving death threats over the phone from the assailants, including many text messages stating, e.g., that "this isn't over" and "what you've done will not be left unpunished." The callers told Rene that they would kill him and his family because of "what [Rene's associate] had done to their partner." The associate

received similar threats. Rene eventually changed his phone number, and the threats temporarily stopped. Sometime thereafter, however, Rene and Barnica received a "crumpled-up note" at their home stating that, "no matter how much [they] hide," these men would find them "to take revenge." It further stated that the authors of the note "already knew that [Rene and Barnica] had a daughter" -- who was Ashley, an infant at the time -- and that they "were going to start off with [her]." The couple did not report these threats to the police, believing that doing so would be futile. They feared that Ashley would be killed if they stayed in Honduras and so decided to leave.

In December 2013, Barnica and Ashley (together, the "Barnicas") entered the United States without inspection and were placed in removal proceedings for unlawful entry, pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182 (a)(6)(A)(i)). The Barnicas conceded removability and, with the aid of counsel, applied for asylum, withholding of removal, and protection under CAT. As grounds for asylum and withholding of removal under the INA, the Barnicas claimed that the series of death threats they received amounted to past persecution due to their family relationship to Rene and that, if returned to Honduras, they would suffer further persecution on that protected ground. They did not separately articulate a basis for CAT protection. An IJ denied the Barnicas' asylum and

- 4 -

withholding of removal applications upon finding that they had failed to demonstrate that a protected ground was "one central reason" for past or future persecution. The IJ denied their request for CAT protection on the ground that the Barnicas had failed to prove a clear probability that they would be tortured with the acquiescence of the Honduran government if repatriated. The BIA affirmed that determination, largely adopting the IJ's reasoning, although the BIA deemed certain essential aspects of the petitioners' CAT claims to be waived on appeal.[2] This timely petition followed.

---

[2] We agree that the Barnicas failed to administratively exhaust their challenges to the agency's denial of CAT protection, as the administrative record contains no developed argumentation to the BIA specifically about the Barnicas' purported entitlement to protection on this basis.

In their brief to us, the Barnicas contend that the IJ erred in implicitly finding that the "[m]ental pain or suffering" resulting from the death threats did not amount to past torture, see 8 C.F.R. § 1208.18(a)(4), and they also contend that the "[i]nadequate [r]esponsive [a]ction and [p]rotection" from the Honduran police compelled a finding that they were and would be subjected to torture "by" or "with . . . the acquiescence of" the Honduran police, see id. § 1208.18(a)(1). But neither of these arguments was presented in the Barnicas' appeal to the BIA. Rather, their appellate brief to the BIA focused exclusively on their asylum and withholding of removal claims and the elements necessary to qualify for those distinct forms of relief. We have repeatedly held that "[a] petitioner's 'failure to present developed argumentation to the BIA on a particular theory [of relief] amounts to a failure to exhaust administrative remedies as to that theory.'" Yong Gao v. Barr, 950 F.3d 147, 153 (1st Cir. 2020) (quoting Avelar Gonzalez v. Whitaker, 908 F.3d 820, 828 (1st Cir. 2018)); see, e.g., De Lima v. Sessions, 867 F.3d 260, 267 (1st Cir. 2017); Pérez Batres v. Lynch, 796 F.3d 157, 160 (1st Cir. 2015). Accordingly, we dismiss their petition insofar as it seeks review of the denial of CAT relief.

In their challenge to the agency's denial of their requests for asylum and withholding of removal under the INA, the Barnicas contend that the agency erred in finding that they failed to establish that they have been or would be persecuted "on account of" a statutorily protected ground. We disagree.

**A.**

Our review "typically focuses on the final decision of the BIA," Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020), but "[w]here, as here, the BIA 'adopts and affirms the IJ's ruling' but nevertheless 'examines some of the IJ's conclusions,' we review both the BIA and IJ opinions as a unit," Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020) (quoting Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012)). In so doing, we review the agency's legal conclusions de novo, "with some deference to [its] reasonable interpretation of statutes and regulations that fall within its purview," and its factual findings under "the substantial evidence rule." Loja-Tene, 975 F.3d at 61 (quoting Pulisir v. Mukasey, 524 F.3d 302, 307 (1st Cir. 2008)). Under the substantial evidence standard, we will only disturb the agency's findings if, in reviewing the record as a whole, "any reasonable adjudicator would be compelled to conclude to the contrary." Gómez-Medina, 975 F.3d at 31 (quoting 8 U.S.C. § 1252(b)(4)(B)).

To qualify for asylum relief, an applicant bears the

burden of proving that she is a refugee within the meaning of the INA. 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 1208.13(a). A "refugee" is someone "who is unable or unwilling to return to" her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); Al Amiri v. Rosen, 985 F.3d 1, 3 (1st Cir. 2021). "Persecution" in this context requires proof of "a certain level of serious harm (whether past or anticipated), a sufficient nexus between that harm and government action or inaction, and a causal connection to one of the statutorily protected grounds" enumerated above. Martínez-Pérez v. Sessions, 897 F.3d 33, 39 (1st Cir. 2018) (quoting Carvalho-Frois v. Holder, 667 F.3d 69, 72 (1st Cir. 2012)).

Applicants may satisfy this burden under one of two approaches. Marín-Portillo v. Lynch, 834 F.3d 99, 101 (1st Cir. 2016); see 8 C.F.R. § 1208.13(b). First, if they can prove that they "suffered from past persecution on account of one or more of the five [protected] grounds," they are entitled to "a rebuttable presumption that their fear of future persecution is well-founded." Marín-Portillo, 834 F.3d at 101 (quoting Butt v. Keisler, 506 F.3d 86, 90 (1st Cir. 2007)). Alternatively, they may prove a well-founded fear of future persecution by presenting "record evidence demonstrat[ing] that they genuinely harbor such

- 7 -

a fear, and that it is objectively reasonable." Id. (quoting Butt, 506 F.3d at 90).

Similarly, "[t]o obtain relief in the form of withholding of removal [under the INA], an alien must establish a clear probability that, if returned to his homeland, he will be persecuted on account of a statutorily protected ground." Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021) (citing 8 U.S.C. § 1231(b)(3)(A)). Like asylum, establishing persecution for withholding of removal purposes requires an applicant to prove "three discrete elements: a threshold level of past or anticipated serious harm, a nexus between that harm and government action or inaction, and a causal connection to one of the five statutorily protected grounds" enumerated above. Id. The difference between the two claims lies only in the requisite likelihood of future persecution and the relevance of subjective fear. See Aguilar-Escoto v. Sessions, 874 F.3d 334, 337-38 (1st Cir. 2017). That is, "[w]ithholding of removal requires . . . a clear probability of persecution, rather than merely [the] well-founded fear of persecution" required for asylum, Sanchez-Vasquez, 994 F.3d at 46 (first alteration in original) (quoting Ang v. Gonzales, 430 F.3d 50, 58 (1st Cir. 2005)), and subjective fear is only relevant for the latter, Aguilar-Escoto, 874 F.3d at 337-38. Accordingly, "asylum precedents may be helpful in analyzing withholding-of-removal cases," and vice versa. Sanchez-Vasquez, 994 F.3d at 46.

**B.**

The Barnicas' petition concerns only the third of these burdens, i.e., whether they established a causal relationship between a statutorily protected ground and the death threats they received in Honduras.

**1.**

For both asylum and withholding of removal purposes, "[a] causal connection exists only if the statutorily protected ground . . . was 'one central reason' for the harm alleged." Id. at 47 (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008) (quoting 8 U.S.C. § 1158(b)(1)(B)(i))). "In many cases, of course, persecutors may have more than one motivation." Singh, 543 F.3d at 5. Where such a "mixed motive" is asserted, "the statutorily protected ground need not be the sole factor driving the alleged persecution" and "the presence of a non-protected motivation does not render an applicant ineligible for [relief]." Loja-Tene, 975 F.3d at 61 (internal quotes and cites omitted). Nevertheless, "to qualify as [one] 'central reason,' for the harm, the [protected] ground cannot be 'incidental, tangential, superficial, or subordinate to another reason for [the] harm.'" Sanchez-Vasquez, 994 F.3d at 47 (quoting Singh, 543 F.3d at 5 (quoting In re J-B-N- & S-M-, 24 I. & N. Dec. 208, 214 (BIA 2007))). And, "[i]n all events, the applicant retains the burden" of proving this element of their claim. Loja-Tene, 975 F.3d at 61.

- 9 -

The Barnicas' principal claim before the agency was that "their family relationship" to Rene was a protected ground and that it was (or would be) at least one central reason for the past (or well-founded fear of future) persecution against them. To support this contention, the Barnicas argued that the death threats they received were "solely because of their familial ties to [Rene,] who was a successful businessman." Put differently, they argued that Rene had been "targeted for violence and menacing threats" after he "refused to give in to his assailants" and that the Barnicas "faced the same danger of retaliation by virtue of their relationship to him." At the hearing before the IJ, however, both Barnica and Rene testified that the assailants' threats were motivated by a desire both to extort their money and to exact revenge for their associate having shot one of the assailants.

In an oral decision, the IJ rejected the Barnicas' asylum and withholding of removal claims after finding that they had failed to establish that a protected ground was "one central reason" for the shooting incident and death threats. First, the IJ agreed with the petitioners that Barnica's and Rene's status as "business owners and gold dealers" was a reason they were "targeted" by the assailants, but determined that "this occupation is not an immutable characteristic and therefore" failed to meet

- 10 -

the applicable test for a particular social group.[3]

Second, the IJ found that, although the Barnicas' family relationship could constitute a particular social group, the evidence failed to establish that "their family membership is one central reason that they were shot at or threatened with death" in the past or reasonably feared they would be in the future. Rather, the IJ found that the Barnicas were victims of criminal violence and threats "due to transporting cash and gold and the revenge that the criminals sought to extract once [their associate] shot back and killed one of the assailants."

The BIA affirmed the IJ's findings in a written decision, noting that neither "general violence and civil strife" nor "personal disputes based on revenge" ordinarily demonstrate a nexus to a protected ground, citing Marín-Portillo v. Lynch, 834 F.3d 99, 101-02 (1st Cir. 2016) and Escobar v. Holder, 698 F.3d 36, 38 (1st Cir. 2012). The BIA further noted that, here, the IJ supportably found that "the only allusion to the [Barnicas'] family was that the criminals, in making one of the threats, stated that they knew [Barnica] had a daughter," but that Barnica had not "otherwise provided evidence demonstrating that one central reason

---

[3] The Barnicas do not challenge this determination in their petition for review, so we do not consider it here. See Perez Vasquez v. Garland, 4 F.4th 213, 220 n.4 (4th Cir. 2021).

- 11 -

for the shooting incident or the subsequent death threats was the criminals' desire to overcome this protected ground."

## 2.

In their petition for review, the Barnicas essentially advance three interrelated claims of error: 1) that the agency committed legal error by failing to recognize "that there may be more than one central reason for past persecution" and by ignoring certain evidence of family targeting; 2) that the agency erred in finding that their family membership was not at least one central reason for their past persecution; and 3) that the BIA erroneously deemed other proposed social groups reformulated in their appeal to be waived. None of these claims of error is availing.

### i.

The Barnicas' contention that the agency erred as a matter of law by failing to "consider[] . . . the idea that there may be more than one central reason for past persecution" and overlooking certain evidence "suggest[ing] specific targeting of the family" is belied by the record.

While we have remanded agency decisions that incorrectly concluded "that a family cannot qualify as a particular social group" without more, Aldana-Ramos v. Holder, 757 F.3d 9, 15 (1st Cir. 2014) (emphasis added), as well as agency decisions that failed to "utilize[] a mixed-motive or 'at least one central reason' analysis, as the statute requires," Enamorado-Rodriguez

- 12 -

v. Barr, 941 F.3d 589, 596-97 (1st Cir. 2019), the agency's decision in this matter suffers from neither infirmity. The agency accepted the Barnicas' family relationship as a cognizable social group and repeatedly cited to and correctly applied the "one central reason" standard in examining the nexus between that protected ground and the harm they suffered. In so doing, the agency necessarily "acknowledged the possibility of a mixed-motive case, but based on the evidence presented, made a fact-specific determination that [the Barnicas] had not shown that the persecution was motivated by a family relationship." Villalta-Martinez v. Sessions, 882 F.3d 20, 24 (1st Cir. 2018). Accordingly, the Barnicas' first claim of legal error comes up dry. Cf. Loja-Tene, 975 F.3d at 61-62 (holding that "the agency did not improperly preclude the possibility of mixed-motive persecution" where, as here, the agency properly applied the "one central reason" standard (citing Villalta-Martinez, 882 F.3d at 24 (same))).

Nor can we agree with the Barnicas' contention that the agency ignored any evidence relevant to the causation inquiry. In arguing otherwise, the Barnicas point to written statements submitted by Barnica, Rene, and an associate, recounting the roadway attack and the apparent motivation behind the subsequent death threats received by Rene. Specifically, they contend that the IJ ignored Barnica's statement that she believed the threats

were motivated by the assailants' desire to "make a public statement about what happens to people who attempt to defend themselves." Similarly, the associate stated his belief that "[w]hen [the assailants] were unsuccessful in their pursuits, they became enraged and their goal is now to kill Rene, [Barnica, and their two associates] to demonstrate how powerful they are."

But the IJ explicitly stated that she considered these submissions and accepted them into the record. Although the IJ did not specifically discuss these statements in her analysis, that failure is not fatal. Although "an IJ may not simply ignore substantial testimonial and documentary proof, she need not discuss ad nauseam every piece of evidence." Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir. 2007). "So long as the IJ has given reasoned consideration to the evidence as a whole, made supportable findings, and adequately explained its reasoning, no more is exigible." Id. Here, the IJ did so. Indeed, the evidence discussed above is consistent with the IJ's ultimate finding that the threats were due to "the revenge that the criminals sought to extract" in retaliation for resistance to the attempted robbery. Thus, we cannot conclude that this evidence was ignored. Cf. Sok v. Mukasey, 541 F.3d 43, 47 (1st Cir. 2008).

## ii.

Next, the Barnicas broadly contend that the agency erred in finding that their family relationship to Rene was not "one

central reason for [their] past persecution." This is a factual finding that we review under the "'highly deferential' substantial evidence rule." Loja-Tene, 975 F.3d at 62 (quoting Lopez de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007)); see also Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014). Accordingly, we consider whether the record considered as a whole "compel[s] [a] contrary conclusion" to that reached by the agency, Sompotan v. Mukasey, 533 F.3d 63, 68 (1st Cir. 2008) (quoting Lopez de Hincapie, 494 F.3d at 218), and conclude that it does not.

"In order for family membership to serve as 'the linchpin for a protected social group,' it 'must be at the root of the persecution, so that family membership itself brings about the persecutorial conduct.'" Ruiz-Escobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018) (quoting Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008)); see also Perlera-Sola, 699 F.3d at 576 ("This 'kinship' criterion, it should be stressed, applies only where the motivation for persecution is kinship and not because multiple family members happen to be persecuted for a common reason but the animus is not kinship."). Here, the record evidence does not compel a finding that the Barnicas made this demonstration.

Indeed, the IJ's finding that "[t]he only [a]llusion to the [Barnicas'] family from the criminals" was the final letter's mention that Barnica and Rene had a daughter is supported by the

record. [4]

No other evidence concerning the death threats suggested any kinship-motivated targeting, and the Barnicas concede that the criminals' "initial" motivation in attempting to rob Rene and Barnica was due to the gold they were carrying rather than any animosity towards their nuclear family. Moreover, the record amply supports the agency's finding that the subsequent death threats were motivated by "revenge." Although the "at least one central reason" standard does "not require an asylum applicant to demonstrate that he was singled out only due to his protected trait," Enamorado-Rodriguez, 941 F.3d at 596 (quoting Ordonez-Quino, 760 F.3d at 90), the protected ground must be more than "incidental, tangential, superficial, or subordinate to another reason for [the] harm" to qualify as "one central reason." Sanchez-Vasquez, 994 F.3d at 47 (quoting Singh, 543 F.3d at 5).

Substantial evidence supports the agency's implicit

_____

[4] The Barnicas also contend that the IJ's characterization of this reference as an "illusion" demonstrates that the agency "only briefly acknowledge[d]" their argument about their family membership being a central reason for their persecution. But this apparent transcription error was corrected to "allusion" by the BIA, and both agency decisions treated the Barnicas' family membership as lying at the heart of their claims. In any event, and as previously discussed, "the body of the BIA's opinion (like the IJ's [oral decision]) makes clear that [the agency] understood that actions may be driven by more than one central motive." Loja-Tene, 975 F.3d at 61 n.2. Thus, even if the IJ meant "illusion," rather than "allusion," we have regularly declined to give dispositive weight to such an "isolated lapsus linguae." Id. The agency plainly considered the death threats directed at the family.

finding that the Barnicas' family ties to Rene were incidental or subordinate to the assailants' vengeful purpose, rather than "at the root of [the death threats]." Ruiz-Escobar, 881 F.3d at 259 (quoting Ruiz, 526 F.3d at 38).  It is well established that "[e]vents that stem from personal disputes are generally not enough to show the required nexus" between past harm and a protected ground, Sompotan, 533 F.3d at 71, and we have long "viewed disputes motivated by revenge as personal in nature," Marín-Portillo, 834 F.3d at 101 (citing Costa v. Holder, 733 F.3d 13, 17 (1st Cir. 2013)).  In acknowledging this precedent, the agency supportably found that the death threats at issue were motivated by revenge, as both Barnica and Rene consistently testified that they believed they were threatened because an associate had shot one of the assailants.  Indeed, Rene succinctly stated that "it was revenge" that the men were after.  His credited testimony was further bolstered by evidence of the content of some of these threats -- which were described as saying "this isn't over" and "what you've done will not be left unpunished" -- as well as evidence that a non-family member also received similar threats.  Cf. Villalta-Martinez, 882 F.3d at 23-24 (testimony supporting finding that gang members targeted all employees of petitioner's partner's store for extortion contributed to substantial evidence that petitioner's family relationship with the store owner was not one central reason for the threats directed at her).

- 17 -

The mere fact that the Barnicas received threats as a family unit, without more, "does not convert the non-protected criminal motivation into persecution on the basis of family connections." Loja-Tene, 975 F.3d at 62 (quoting Aldana-Ramos, 757 F.3d at 19). Rather, "family membership itself [must] bring[] about the persecutorial conduct" to constitute one central reason. Ruiz-Escobar, 881 F.3d at 259 (quoting Ruiz, 526 F.3d at 38); see also Perlera-Sola, 699 F.3d at 576-77. The agency's determination that evidence of such a kinship-centered animus was lacking is supported by substantial evidence, as we cannot say that "a reasonable adjudicator would be compelled to conclude to the contrary." Villalta-Martinez, 882 F.3d at 24; cf. Loja-Tene, 975 F.3d at 62 (holding that substantial evidence supported agency's finding that "family ties did not motivate the petitioner's persecution, even though those ties may have brought him into proximity with his persecutor"); Marín-Portillo, 834 F.3d at 102 ("The mere fact that [the persecutor] . . . targeted members of [the petitioner's] family does not . . . mean that the only logical inference is that kinship ties, rather than the desire for retaliation or deterrence, prompted [the persecutor's] threats." (internal quotes omitted)).

### iii.

Lastly, the Barnicas contend that the BIA erred in finding that they had waived two other proposed social groups by

failing to raise them before the IJ. The two groups were described in briefing to the BIA as (i) "recognizable immediate family members of successful and highly-targeted individuals," and (ii) "individuals who are targeted after refusing to be victimized by criminals." The BIA declined to address these groups on appeal, relying on agency precedent requiring an applicant to "clearly indicate" on the record before the IJ "the exact delineation" of any proposed social group and noting that the BIA will generally not consider "a new social group that is substantially different from the one delineated below." Matter of W-Y-C- & H-O-B-, 27 I. & N. Dec. 189, 191-92 (BIA 2018). The Barnicas argue that this was legal error. We review questions of law de novo. Loja-Tene, 975 F.3d at 61; see also Cantarero-Lagos v. Barr, 924 F.3d 145, 149 (5th Cir. 2019) (applying de novo review to whether the BIA erred by refusing to consider a reformulated social group).

The Barnicas contend that they preserved these social groups by arguing before the IJ that they "suffered persecution due to their membership in a social group as the family of a successful business owner who refused to be victimized." (Emphasis added). But the two groups presented on appeal to the BIA are, on their face, linguistically and logically different from this group proposed to the IJ. Cf. Cantarero-Lagos, 924 F.3d at 150-51. And the Barnicas have failed to advance any explanation or argument for how they are not "substantially different" under Matter of W-

Y-C-.  We therefore deem any such argument waived and do not find that the BIA erred by not considering the proposed social groups. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## III.

For the forgoing reasons, the Barnicas' petition is **denied in part** and otherwise **dismissed** for lack of jurisdiction.