# United States Court of Appeals
## For the First Circuit

No. 23-1543

PAMLAR FERREIRA,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

SangYeob Kim, with whom Gilles Bissonnette and American Civil Liberties Union of New Hampshire were on brief, for petitioner.

Joseph A. O'Connell, Attorney, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, and Cindy S. Ferrier, Assistant Director, were on brief, for respondent.

Daniel V. Ward, Marianne Staniunas, Abigail Alfaro, Michelle Marie Mlacker, Colleen S. Roberts, and Ropes & Gray LLP on brief for Immigration Law Professors et al., amici curiae.

Deborah Anker, Sabrineh Ardalan, Nancy Kelly, John Willshire Carrera, and Harvard Immigration & Refugee Clinical Program on brief for Harvard Immigration and Refugee Clinical Program et al., amici curiae.

March 21, 2024

**RIKELMAN**, **Circuit Judge**.  Pamlar Ferreira petitions for review of a decision by the Board of Immigration Appeals ("BIA") upholding the denial of her application for withholding of removal. Ferreira requests that we remand the case so that the BIA may consider anew whether withholding is appropriate on the basis of her two asserted particular social groups: "family" and "Trinidadian women who oppose Trinidad's social norms in that they do not want to be subjected to abuse or violent sexual abuse by family members or significant others based on their gender."  We grant the petition in part, vacate the BIA's decision as to Ferreira's gender-based claim, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Relevant Facts[1]

Ferreira is a sixty-one-year-old citizen of Trinidad and Tobago.  As a young child, Ferreira lived with her parents and siblings.  When Ferreira was nine, however, her parents divorced, and she went to live with her aunt.  Two other family members resided in her aunt's household: Jason Mujica, the aunt's twenty-

---

[1] "We draw the relevant facts from the administrative record," including Ferreira's testimony, which the immigration judge expressly found to be credible. Barnica-Lopez v. Garland, 59 F.4th 520, 525 n.1 (1st Cir. 2023) (citing Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022)).

three-year-old husband and Ferreira's uncle, and Ferreira's cousin.

The uncle began sexually abusing Ferreira shortly after she joined the household. Although Ferreira resisted, the uncle threatened to kill her mother if she did not comply. The abuse occurred "almost every night" for six years, from the time Ferreira was nine until she was fifteen. Despite threats from her uncle that he would kill her if she left, Ferreira ran away from her aunt's home at the age of fifteen and began living at her grandmother's store. Ferreira testified that she was both afraid of her uncle and ashamed of having been abused by a family member; as a result, she did not go to the police or tell anyone else about the abuse. Instead, she stayed in her grandmother's store, leaving only to attend school.

After leaving her aunt's house, Ferreira never saw or spoke to the uncle again. However, the uncle asked other family members about Ferreira on two separate occasions. First, approximately one month after Ferreira ran away, her older brother informed her that the uncle had asked about her. Second, many decades later, Ferreira's mother, then residing in the United States, encountered the uncle when she returned to Trinidad to sell a property in 2018. During the encounter, which we describe in detail below, the uncle asked about Ferreira and whether she

was ever returning to Trinidad. Ferreira's mother lied and told the uncle that she had lost touch with Ferreira.

When Ferreira came to the United States in the mid-1980s, at the age of twenty-three, she told her sister about the uncle's abuse, but her sister did not believe her. In 2010, Ferreira was diagnosed with post-traumatic stress disorder, a condition she attributes to the years of sexual abuse she endured.

The last interaction between the uncle and Ferreira's nuclear family was in 2018, when Ferreira's mother briefly returned to Trinidad to sell her house. The uncle, accompanied by three or four other men, accosted the mother at her property and attempted to rob her. The men tied the mother to a chair for several hours before releasing her. Ferreira's mother never reported the incident to police.

## B. Legal Proceedings

On December 21, 1985, Ferreira entered the United States on a B-2 nonimmigrant visa with authorization to remain for up to six months. Ferreira has resided in the United States without authorization since her visa expired.

In March 2019, Ferreira was convicted in the United States District Court for the District of New Hampshire of three criminal charges related to her fraudulent application for a United

States passport.[2]  The district court sentenced her to twelve months and one day of incarceration.

The Department of Homeland Security then commenced removal proceedings against Ferreira on October 4, 2019.  In the Boston Immigration Court, Ferreira initially applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), but she later clarified that she would seek only withholding of removal and protection under the CAT.[3]  Ferreira's statutory withholding claim was based on her membership in two particular social groups ("PSGs"): (1) "Trinidadian women who oppose Trinidad's social norms in that they do not want to be subjected to abuse or violent sexual abuse by family members or significant others based on their gender"; and (2) "family."  By "family," Ferreira explained that her persecutor's "relationship as her uncle forms a social group because the fact that they are related is a definitive characteristic that cannot be changed; their kinship is fundamental to their identities."

In her pre-hearing briefing and testimony before the immigration judge ("IJ"), Ferreira recounted the abuse she

---

[2] See 18 U.S.C. § 1001(a)(2) (false statements); 18 U.S.C. § 911 (false claim of citizenship); 42 U.S.C. § 408(a)(7)(B) (false representation of a social security number).

[3] Ferreira only seeks review of the denial of her statutory withholding claim.  Therefore, in recounting the decisions below, we limit our discussion to the withholding analysis.

- 6 -

experienced as a child and her ongoing fear of her uncle. Ferreira also testified that the uncle was now at least seventy years old and she could not confirm that he was still alive or that he would have any interest in harming her if she returned to Trinidad. Ferreira stated that, if she did return to Trinidad and her uncle were still alive, she would try to report him to the police.

The IJ issued his opinion on February 12, 2020. He concluded both that Ferreira was credible and that the abuse Ferreira experienced was severe enough to rise to the level of persecution. Nonetheless, the IJ denied Ferreira's statutory withholding claim.

First, the IJ held that neither of Ferreira's proffered PSGs were legally cognizable. Assessing Ferreira's family-based PSG, the IJ concluded that Ferreira failed to demonstrate that her family was socially distinct within Trinidad, citing Matter of L-E-A-, 27 I.& N. Dec. 581 (A.G. 2019), later vacated by Matter of L-E-A-, 28 I. & N. Dec. 304 (A.G. 2021). Addressing Ferreira's gender-based PSG, the IJ found that the PSG was not particular because "it is not clear what someone would have to do to oppose a social norm in Trinidad, nor is it clear . . . what the Trinidad social norms are." Further, the IJ concluded that the gender-based PSG was too amorphous and lacked social distinction because of "insufficient evidence that [those] opposing Trinidad social norms are recognized as discrete elements of society."

- 7 -

Second, the IJ determined that, even if Ferreira's asserted PSGs were cognizable, Ferreira's abuse was not "on account of" a statutorily protected ground. The IJ found that "there [was] insufficient evidence the uncle was motivated [to harm] or targeted" Ferreira because of her membership in either PSG. Instead, the uncle was a "predator" who committed "a criminal act of child abuse," and he focused on Ferreira because she "was younger than him" and because of her "proximity" to him "under his own roof."

Ferreira appealed the IJ's decision to the BIA. However, the BIA received her initial brief a day late, and Ferreira later resubmitted it with a motion to accept the late-filed brief. The BIA did not rule on Ferreira's motion but affirmed the IJ's decision without issuing an opinion. Ferreira then sought review from this court. See Ferreira v. Garland, No. 20-1865 (1st Cir. 2020). After Ferreira submitted her opening brief, the government filed an unopposed motion to remand the case back to the BIA; we granted that motion.

On remand, the BIA once again affirmed the IJ's denial of Ferreira's statutory withholding claim. As to the family-based claim, the BIA did not adopt the IJ's cognizability analysis and instead acknowledged that "family" can constitute a valid PSG. Nevertheless, the BIA upheld the IJ's rejection of Ferreira's family-based claim on nexus grounds, finding "no clear error" in

the IJ's determination that there was insufficient evidence that the uncle was motivated to harm Ferreira or targeted her based on her membership in their family. The BIA also expressly agreed with the IJ's finding that "the uncle's criminal intent fueled [his] abuse of [Ferreira]."

The BIA then turned to the gender-based PSG and agreed with the IJ that it was not legally cognizable. Framing Ferreira's PSG as "women who are subjected to and oppose" gender-based violence, the BIA adopted the IJ's legal determination that this PSG was amorphous and not defined with particularity. It also concluded that the PSG was circular because it was "impermissibly defined in large part by the harm inflicted on its members." Finally, although Ferreira had argued to the BIA that "a true articulation" of her gender-based PSG may have been "Trinidadian women" or "female Trinidadian survivors of domestic violence," the BIA declined to address any "other particular social groups [offered] for the first time on appeal," citing Matter of W-Y-C- & H-O-B-, 27 I. & N. Dec. 189, 190-91 (BIA 2018). Ferreira timely sought review from our court.

## II. DISCUSSION

### A. Legal Framework

We begin by discussing the legal framework governing Ferreira's claims. As factfinder, the IJ "conduct[s] proceedings for deciding the inadmissibility or deportability" of an individual. 8 U.S.C. § 1229a(a)(1); see also 8 C.F.R. § 1003.10(a). On appeal, the BIA is tasked with reviewing the IJ's factual conclusions for clear error. 8 C.F.R. § 1003.1(d)(3)(i). But the BIA reviews de novo "questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges," 8 C.F.R. § 1003.1(d)(3)(ii), including the ultimate conclusion of whether the facts identified by the IJ are sufficient to satisfy the legal requirements of nexus, see Matter of S-E-G-, 24 I. & N. Dec. 579, 588 n.5 (BIA 2008) ("The record before us is adequate to allow us to perform de novo review of the legal issues presented, specifically, whether the [applicants] established that they were persecuted 'on account of' a protected ground.").

Turning to our standard of review, we "typically focus[] on the final decision of the BIA." Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020). However, "to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision" as well. Chavez v. Garland, 51 F.4th 424,

- 10 -

429 (1st Cir. 2022) (citing <u>Bonilla</u> v. <u>Mukasey</u>, 539 F.3d 72, 76 (1st Cir. 2008)).

We review the BIA's legal conclusions de novo "with 'some deference to its interpretations of statutes and regulations related to immigration matters.'" <u>Espinoza-Ochoa</u> v. <u>Garland</u>, 89 F.4th 222, 230 (1st Cir. 2023) (quoting <u>Aldana-Ramos</u> v. <u>Holder</u>, 757 F.3d 9, 14 (1st Cir. 2014)).[4] We uphold factual findings under the substantial evidence standard unless the record compels a contrary conclusion. <u>Id.</u> (citing <u>Varela-Chavarria</u> v. <u>Garland</u>, 86 F.4th 443, 449 (1st Cir. 2023)). When discussing the BIA and IJ's decisions as a unit, we refer to them jointly as "the agency." <u>Pineda-Maldonado</u> v. <u>Garland</u>, 91 F.4th 76, 80 (1st Cir. 2024).

An applicant for withholding of removal "must establish a clear probability that, if returned to [her] homeland, [s]he

---

[4] In a footnote, Ferreira points out that although the BIA reviews de novo the ultimate legal conclusion of whether the facts and evidence are sufficient to satisfy the nexus requirement, this court reviews the BIA's nexus determination under the substantial evidence standard. As Ferreira recognizes, our decision in <u>Aguilar-Escoto</u> v. <u>Garland</u> noted the tension inherent in applying the substantial evidence standard, a mode of review "reserved for factual findings," to "the determination of whether a given set of facts meets the standard of persecution," a legal conclusion. 59 F.4th 510, 519-520 (1st Cir. 2023). This same tension exists in how we review the agency's nexus conclusion, which, as with persecution, involves factual determinations by the IJ but a de novo review by the BIA as to whether those facts taken together are sufficient to meet the legal standard. <u>See</u> 8 C.F.R. 1003.1(d)(3)(ii); <u>Matter of S-E-G-</u>, 24 I. & N. Dec. at 588 n.5. However, Ferreira does not ask us to resolve the tension in these different standards of review.

will be persecuted on account of a statutorily protected ground." Varela-Chavarria, 86 F.4th at 449 (alterations in original) (quoting Sanchez-Vasquez v. Garland, 994 F.3d 40, 46 (1st Cir. 2021)). To satisfy this standard, an applicant must meet a three-part test: "a threshold level of past or anticipated serious harm, a nexus between that harm and government action or inaction, and a causal connection to one of the five statutorily protected grounds." Espinoza-Ochoa, 89 F.4th at 230 (citation omitted).

The statutorily protected grounds include "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). When "an applicant [is] seeking relief based on [her] membership in a PSG [she] 'must establish that the group is: (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" Espinoza-Ochoa, 89 F.4th at 231 (quoting Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015)).

To meet the nexus requirement, an applicant must demonstrate "that [her] persecution was 'on account of' [the] protected ground, meaning that the protected ground was 'at least one central reason' for the persecution." Id. at 235 (emphasis and internal citations omitted). That does not mean that the applicant must "demonstrate that [s]he was singled out only due to [her] protected trait" or even that the protected trait was the

- 12 -

most important reason for the persecution. Id. (quoting Barnica-Lopez, 59 F.4th at 531).[5] Instead, she must show that the PSG "was not 'incidental, tangential, superficial, or subordinate to another reason for [the] harm.'" Id. (alteration in original) (quoting Barnica-Lopez, 59 F.4th at 531).

"In the case of withholding of removal . . . evidence of past persecution creates a rebuttable presumption of future persecution." Pineda-Maldonado, 91 F.4th at 82-83.

### B. Family-Based PSG

The BIA found that Ferreira was not entitled to withholding of removal on the basis of her family-based PSG because she failed to demonstrate a nexus between the abuse she experienced and her family membership. In reaching this conclusion, the BIA relied on the IJ's factual findings that the abuse was "a criminal act done by a predator based on his proximity to the victim" and that there was "insufficient evidence the uncle was motivated [to harm] or targeted [Ferreira] because of family." Ferreira challenges the BIA's rejection of her family-based PSG claim on both factual and legal grounds. After careful consideration, we conclude that the record does not compel a contrary conclusion as

---

[5] "Due to the substantive similarities in the standards for asylum and withholding of removal claims, asylum precedents may be helpful in analyzing withholding-of-removal cases, and vice versa." Espinoza-Ochoa, 89 F.4th at 230 (internal quotations omitted) (quoting Barnica-Lopez, 59 F.4th at 528).

- 13 -

to the underlying facts and find no legal errors in the BIA's analysis.

We have frequently had cause to consider if persecution is "on account of" family membership. See id. at 85 (collecting cases). Our precedent provides that "[i]n order for family membership to serve as 'the linchpin for a protected social group,' it 'must be at the root of the persecution, so that family membership itself brings about the persecutorial conduct.'" Ruiz-Escobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018) (quoting Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008)); see also Matter of L-E-A-, 27 I. & N. Dec. 40, 43-44 (BIA 2017) ("If the persecutor would have treated the applicant the same if the protected characteristic of the family did not exist, then the applicant has not established a claim on this ground."). We also consider whether it is possible to "'disentangle' the applicant's family status" from the persecutor's other motives, or if "they are two sides of the same coin." Pineda-Maldonado, 91 F.4th at 88-89 (quoting Perez-Sanchez v. U.S. Att'y Gen., 935 F.3d 1148, 1158 (11th Cir. 2019)). Therefore, the "fact-dependent nature of the nexus inquiry" is of particular importance when we assess "claims of persecution 'on account of' family status." Id. at 86.

We thus begin with Ferreira's argument that the agency did not fully consider her credible testimony and the documentary country conditions evidence when it found that her abuse was "a

- 14 -

criminal act done by a predator based on his proximity to the victim" -- not a result of Ferreira's family membership. The decisions below, however, demonstrate that the agency did consider the aspects of the record that Ferreira brings to our attention.

As to Ferreira's testimony, our review of the record reveals that Ferreira never stated that she believed her uncle abused her because she was his niece. Instead, Ferreira testified that the uncle abused her "because he[ was] having a good time[, and] . . . he[ was] enjoying it," consistent with the IJ's finding that his abuse was motivated by his own criminal, sexual desires.

Ferreira's account of the timeline of the abuse also supports the IJ's factual finding and so fails to show that the agency did not consider the evidence that she contends supports her claim. Ferreira testified that after she went to live with her aunt's family, her uncle sexually abused her from the ages of nine to fifteen. Ferreira did not experience abuse before moving into the aunt's home. And after Ferreira ran away from the home, she never saw or spoke to the uncle again. The IJ relied on the fact that the uncle "never harmed her before or after she lived there" as evidence that Ferreira's proximity in the uncle's home was the underlying reason for the abuse, not her status as the uncle's niece, a family connection that both pre- and post-dated the abuse.

Relatedly, Ferreira contends that she "credibly testified that the uncle continuously pursued [her] even after she escaped from the house" and objects to the agency's factual finding to the contrary. But the record does not support Ferreira on this point. In the decade after her abuse, Ferreira's own testimony establishes that the uncle inquired about her only on a single occasion, when he spoke to Ferreira's brother, approximately one month after she ran away. This single instance of inquiry is insufficient to compel a contrary conclusion on this factual issue. The evidence on which Ferreira relies also is insufficient to show that the IJ's findings were clearly erroneous such that the BIA legally erred in its application of clear-error review.

Moving to her country conditions evidence, Ferreira argues that the agency ignored this evidence altogether in its nexus analysis. But the IJ expressly discussed the "seven numbered exhibits" Ferreira had submitted into the record below, which included the country conditions reports, and stated that he had considered those exhibits, whether discussed in his decision or not. And the BIA explicitly noted that it had considered Ferreira's arguments on appeal following remand, citing to the pages of her brief that discussed the documentary evidence and holding it found her arguments "not persuasive."

To be sure, in some situations this generic language would be insufficient and would justify a decision to vacate,

including when the evidence at issue provides particularly strong support for the applicant or when there are other indications the agency simply turned a "blind eye" to relevant evidence. Aguilar-Escoto, 59 F.4th at 515. But that is not the case here. Instead, the documentary evidence generally discusses societal conditions in Trinidad, such as "male dominance in the family" and statistics showing the prevalence of domestic violence, including sexual abuse, and provides basic background facts that the parties do not dispute. Ferreira argues that these societal conditions contributed to her uncle's decision to select her for abuse, such that their family connection was part of the reason she was targeted. But the country conditions evidence, although important, is not sufficient to establish persecution on the basis of family membership in every case. There is no doubt that the sexual abuse Ferreira endured was horrific and easily meets the standard for persecution. But the IJ's factual finding that there was no nexus between the family relationship and that persecution is supported by substantial evidence, and thus, here, too, the BIA did not err in its application of clear-error review.

Ferreira also urges us to vacate based on what she views as legal errors in the agency's nexus analysis. Ferreira's legal challenges to the rejection of her family-based PSG focus on four overlapping arguments: (1) the BIA was obligated to conduct a de novo review of the IJ's ultimate nexus conclusion; (2) the agency

cited but never applied a mixed-motive analysis and thus failed to consider if her family-based PSG was intertwined with her uncle's criminal motivation; (3) the agency never conducted what she describes as an unwilling or unable analysis; and (4) the agency never considered her standalone claim of future persecution.

As we have explained, the BIA does have an obligation to review de novo the IJ's ultimate nexus conclusion in light of the arguments presented by a petitioner. See Matter of S-E-G-, 24 I. & N. Dec. at 588 n.5. Here, the BIA's decision indicates that it did consider each of Ferreira's nexus-related arguments and thus committed no legal error in affirming the IJ's ultimate nexus conclusion.

We begin with Ferreira's argument that the agency never engaged in a mixed-motive analysis. Our review reveals that the IJ did not ignore the possibility of multiple motives but simply concluded that, on this record, there was not enough evidence to establish other motivations or reasons for the abuse. Specifically, the IJ found that there was "insufficient evidence" to conclude that Ferreira was targeted on the basis of her family membership. Instead, the IJ found her abuse was on account of other factors: Ferreira was a child, she was living in the uncle's house, and the uncle was "a predator." The BIA affirmed that Ferreira's abuse was on account of these reasons and held there

was "no nexus" between Ferreira's family-based PSG and the harm she experienced.

Ferreira argues that the "close physical proximity" to her uncle occurred only because of their family relationship. But although the family relationship was the reason that Ferreira ended up living with the uncle, the record here does not compel the conclusion that the "family membership itself [brought] about the persecutorial conduct." Ruiz-Escobar, 881 F.3d at 259 (quoting Ruiz, 526 F.3d at 38). Rather, there is record support for the IJ's finding that the uncle targeted Ferreira because she was present in his home, regardless of their relationship. As a result, there is substantial evidence for "the agency's conclusion that family ties did not motivate [Ferreira's] persecution, even though those ties may have brought [her] into proximity with [her] persecutor." Loja-Tene, 975 F.3d at 62.

In sum, the BIA held that there was "no nexus" between Ferreira's persecution and her status as her persecutor's niece. Because there is substantial evidence in the record here for that finding, the BIA did not need to go further. Pineda-Maldonado, 91 F.4th at 85 ("[W]e do not disagree with the agency that, insofar as the record supportably shows in this case that the mistreatment at issue was solely driven by a [motivation not protected under

the statute], there would be no basis for overturning the agency's nexus finding.").[6]

We turn next to Ferreira's contention that the BIA failed to conduct what she describes as an unwilling or unable analysis.[7] In her brief to the BIA, Ferreira argued that "nexus may flow from the reasons for lack of state protection, rather than the reasons motivating" the persecutor. Specifically, Ferreira contended that the Trinidadian government was unwilling or unable to protect Ferreira from her uncle's sexual abuse because the government does not intervene in situations of domestic violence, which are perceived in Trinidad as "family matter[s]."

We conclude that the BIA did consider this argument and find no legal error in its analysis. After discussing both PSGs,

_____

[6] Ferreira and her amici also invite us to reject our past application of the "one central reason" nexus standard for evaluating mixed-motive withholding of removal claims and to instead adopt a less demanding "a reason" standard, which they argue better accords with the plain meaning of the withholding statute. However, we decline to opine on the mixed-motive standard for withholding of removal in a case where the agency did not err in concluding that the asserted protected ground (here, family) was not even a reason for the applicant's persecution.

[7] In a supplemental brief, the government argues that Ferreira waived the unwilling or unable argument because she did not advance it before the IJ. The BIA did not raise the issue of waiver or forfeiture as to any of Ferreira's nexus arguments but rather dismissed them as "not persuasive." As such, we assume without deciding that Ferreira adequately raised the issue. See James v. Garland, 16 F.4th 320, 321 n.1 (1st Cir. 2021) (not addressing issue of waiver when BIA did not raise or address potential waiver).

the BIA included a final paragraph in its decision indicating that it had considered all of Ferreira's arguments "concerning the two relevant particular social groups in this case (Respondent's Brief at 7-21)" and rejected them as "not persuasive" and "largely rely[ing] on cases arising outside the jurisdiction of the First Circuit." Ferreira's alternative nexus argument is included in the page range delineated by the BIA. And, before both the BIA and this court, Ferreira supports her alternative nexus argument exclusively with out-of-circuit precedent. See Kamar v. Sessions, 875 F.3d 811, 818 (6th Cir. 2017); Sarhan v. Holder, 658 F.3d 649, 656 (7th Cir. 2011).[8]

Further, the extent of Ferreira's argument to the BIA on this theory was a single sentence in her brief -- "[c]ircuit courts and the BIA have found that nexus may flow from the reasons for lack of state protection, rather than the reasons motivating the agent of harm" -- followed by a string cite to the out-of-circuit precedent. In both Kamar and Sarhan, however, the two cases on

---

[8] Ferreira also cites Matter of Kasinga, which would be binding on the agency. 21 I. & N. Dec. 357, 367 (BIA 1996) ("We agree with the parties that, as described and documented in this record, FGM [(female genital mutilation)] is practiced, at least in some significant part, to overcome sexual characteristics of young women of the tribe who have not been, and do not wish to be, subjected to FGM. We therefore find that the persecution the applicant fears in Togo is 'on account of' her status as a member of the defined social group."). However, a close review of the nexus holding in that case reveals that the conclusion was still predicated on the motivation of the applicant's persecutors. Id. at 366-67.

which Ferreira relies, the courts evaluated withholding claims based solely on a claim of future persecution. See Kamar, 875 F.3d at 818; Sarhan, 658 F.3d at 660. Specifically, the applicants in Kamar and Sarhan were Jordanian women who alleged that they would be murdered in an "honor killing" if forced to return to their home country and that it would be futile for them to seek protection from the Jordanian government because it would refuse to intervene. See Kamar, 875 F.3d at 818; Sarhan, 658 F.3d at 656-57. In support, both applicants pointed to widespread social norms in Jordan "that impose behavioral standards on women and permit family members to sentence those who violate these standards to death." Kamar, 875 F.3d at 818; see also Sarhan, 658 F.3d at 656 ("[The applicant] faces death because of a widely-held social norm in Jordan -- a norm that imposes behavioral obligations on her and permits [male persecutors] to enforce them in the most drastic way."). The court in each case therefore held that the agency had erred in concluding the applicant would not "be persecuted on account of her membership in the social group she ha[d] identified." Sarhan, 658 F.3d at 656; see also Kamar, 875 F.3d at 820.

Here, by contrast, Ferreira did not testify that if she returned to Trinidad and her uncle attempted to abuse her, the government would refuse to protect her. Instead, Ferreira indicated that she was unsure if her uncle was even alive, and

that, if he were and tried to harm her, she would turn to the police.[9]   Given the factual differences between Ferreira's circumstances and these out-of-circuit cases, the BIA did not err as a matter of law in rejecting Ferreira's alternative nexus claim.

Finally, Ferreira argues that the BIA did not address her claim of family-based future persecution.  As a reminder, to be eligible for withholding of removal, the applicant must demonstrate "that it is 'more likely than not that [she] will be persecuted on account of a protected ground upon [her] return to [her] native land.'"  López-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009) (quoting Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005)).  Unlike in the asylum context, this is solely an objective inquiry that does not consider an applicant's subjective fear. Id. at 54.

Given that we analyze the BIA and IJ's opinions together to the extent the BIA adopts the IJ's decision, Chavez, 51 F.4th at 429, we conclude that the agency did sufficiently address

_____

[9] We note that usually the unwilling or unable analysis concerns whether conduct by a non-government actor can still qualify as persecution.  See, e.g., Aguilar-Escoto, 59 F.4th at 518 ("In order to constitute 'persecution' for purposes of asylum and withholding of removal, harm must either be perpetrated by the government itself or by a private actor that the government is unwilling or unable to control." (citations omitted)).  But the unwilling or unable argument that Ferreira makes to us does not concern the requirement that the government be unwilling or unable to prevent the private conduct in order for that private conduct to qualify as persecution.

- 23 -

Ferreira's claims of future persecution. At the outset of its analysis, the BIA explained that it disagreed with Ferreira that the IJ "should have found a likelihood of persecution on account of one or both [of her] particular social groups." And the IJ clearly found that Ferreira "did not have any objective, well-founded fear of future persecution" on account of her family-based PSG. He noted that Ferreira had not spoken to her uncle since 1985; there was no evidence that the uncle had tried to contact Ferreira in the intervening years, including via phone or social media; and Ferreira herself testified that she was not certain her uncle would even care about her at this juncture. The IJ also discussed the uncle's encounter with Ferreira's mother in 2018, concluded the uncle's harassment was a criminal attempt "to obtain money from respondent's mother because he thought that she had money," and found that their conversation about Ferreira did not support a clear probability of persecution by the uncle. The BIA affirmed the IJ on this point. The BIA also affirmed the IJ's finding that Ferreira's testimony indicated the uncle targeted her mother for pecuniary reasons and not on account of family membership. Based on this record, we find no legal error in the agency's analysis, especially when we also affirm the agency's conclusion that Ferreira had failed to establish past persecution on account of her family membership.

## C. Gender-Based PSG

We now turn to Ferreira's gender-based PSG claim, which the BIA rejected because it concluded her proffered PSG was not legally cognizable. As a secondary holding, the BIA explained that "[t]o the extent the respondent proposes other particular social groups for the first time on appeal, [it] declined to address those groups."

Ferreira argues that the BIA was wrong on both counts. Specifically, she contends the BIA erred in concluding her PSG was not cognizable because it fundamentally misunderstood her proposed PSG and this misunderstanding infected the BIA's subsequent findings on particularity, social distinction, and circularity. With regard to her alternative formulations of her gender-based PSG, Ferreira asserts that the BIA failed to consider if they were "substantially different" from her original PSG, as required under the framework established in Matter of W-Y-C-, 27 I. & N. Dec. at 190-91. Finally, Ferreira argues that the BIA ignored her request to remand to the IJ for additional consideration of her gender-based PSG in light of our intervening decision in De Pena-Paniagua v. Barr, 957 F.3d 88 (1st Cir. 2020).

The gender-based PSG that Ferreira advanced to the agency was "Trinidadian women who oppose Trinidad's social norms in that they do not want to be subjected to abuse or violent sexual abuse by family members or significant others based on their

gender." "Under the BIA's well-established interpretation of the [Immigration and Nationality Act], an applicant seeking relief based on [her] membership in a PSG 'must establish that the group is: (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" Espinoza-Ochoa, 89 F.4th at 231 (quoting Paiz-Morales, 795 F.3d at 244). The social distinction requirement also encompasses the rule against circularity, which requires "that an eligible PSG must 'be perceived as a group by society,' not merely by its persecutors." Id. (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 240 (BIA 2014)).

Although the BIA correctly restated this PSG at the outset of its opinion, when it began its analysis of the PSG in earnest it inaccurately delineated the PSG as "women who are subjected to and oppose such violence." (Emphasis added.) Similarly, the BIA held that "[t]here is insufficient evidence to establish that Trinidadian society recognizes those past victims of domestic violence who oppose such violence as a distinct group." (Emphasis added.) Seemingly on this basis, the BIA also explained that the PSG is "impermissibly defined in large part by the harm inflicted on its members."

The BIA did not accurately represent Ferreira's articulated PSG. On its face, Ferreira's PSG includes all

Trinidadian women who oppose social norms "in that they do not want to be subjected" to gender-based domestic violence. The BIA, by defining Ferreira's group as women "who are subjected to and oppose" gender-based domestic violence, imposed an additional condition: that the women in the PSG also must be survivors of gender-based violence.[10] Ferreira's articulated PSG includes no such limitation. This one alteration was crucial to the BIA's ultimate conclusion that Ferreira's PSG was not cognizable. The BIA rejected her PSG because it was amorphous and defined by the "the harm inflicted on its members." Both conclusions stem from the introduction of "past victims of domestic violence" into the definition of the PSG.

---

[10] The government argues that the BIA's framing of Ferreira's PSG addresses two sub-groups: (1) women who are subjected to gender-based violence and (2) women who oppose such violence, regardless of whether they have previously been subjected to it. Under this reading, the government argues, the BIA both understood and addressed Ferreira's articulated social group. We do not share the government's view. In this context, the word "and" indicates that the two elements "who are subjected to" and "[who] oppose" should be read jointly. See Bruesewitz v. Wyeth LLC, 562 U.S. 223, 236 (2011) ("[L]inking independent ideas is the job of a coordinating [con]junction like 'and.'"). Had the BIA intended for the clauses to be read separately, it should have used the conjunction "or." See Loughrin v. United States, 573 U.S. 351, 357 (2014) (explaining that the ordinary meaning of the word "or" is "almost always disjunctive, that is, the words it connects are to be given separate meanings"). Moreover, the BIA's description of "women who are subjected to and oppose such violence" as "a discrete group" indicates that the BIA intended to refer to a single group of women.

Read correctly, however, Ferreira's PSG can fairly be divided into two parts: a statement of the individuals included in the group ("Trinidadian women who oppose Trinidad's social norms") and a definition of what it means to "oppose Trinidad's social norms" ("in that they do not want to be subjected to abuse or violent sexual abuse by family members or significant others based on their gender"). Accordingly, Ferreira's PSG can be restated simply as "Trinidadian women who oppose gender-based domestic violence." There is no requirement that its members be survivors of such violence.

In sum, the BIA rejected a PSG of its own devising and not the social group Ferreira advanced. Its characterization substantively altered the meaning of Ferreira's proffered PSG and amounts to legal error. See Crespin-Valladares v. Holder, 632 F.3d 117, 125 (4th Cir. 2011) (The "[legal] error flowed from the fact that, as the Government concedes, the BIA's removal order rejected a group different from that which the Crespins proposed.").

The government contends that, even properly formulated, Ferreira's PSG is not cognizable because it lacks social distinctiveness and particularity, and we may therefore affirm the agency's denial of Ferreira's claim of withholding of removal on that ground. We note that particularity and social distinctiveness are context-specific inquiries. See Perez-Rabanales v. Sessions,

881 F.3d 61, 66 (1st Cir. 2018) ("The particularity requirement seeks to determine whether a proffered social group can be described in a manner sufficiently unique to ensure that the group would be recognized in its own society as a discrete class of persons."); Matter of M-E-V-G-, 26 I. & N. Dec. at 241 (stating that the particularity and social distinctiveness requirements are to be "applied in the fact-specific context of an applicant's claim for relief"). Critically, the agency has not had an opportunity to pass on the proper formulation of Ferreira's PSG, and due to the record-dependent nature of the inquiry, it should have the opportunity to do so in the first instance. For that reason, we remand to the BIA. On remand, the BIA should carefully consider Ferreira's gender-based PSG in light of our decisions in De Pena-Paniagua and Espinoza-Ochoa.

Before we end, we consider Ferreira's claim that the BIA should have determined, or remanded to the IJ to determine in the first instance, whether "Trinidadian women" was an appropriate reading of her gender-based PSG. In her briefing to the BIA, Ferreira explained that "a true articulation" of her gender-based PSG "may have been 'Trinidadian women'" and identified portions of the record arguably supporting her contention that she implicitly advanced the "Trinidadian women" formulation of her PSG at the outset.

In a footnote, the BIA explained that "[t]o the extent [Ferreira] proposes other particular social groups for the first time on appeal, [it] decline[d] to address those groups," citing Matter of W-Y-C-, 27 I. & N. Dec. at 190-91. Ferreira argues that this brief footnote is not enough to demonstrate that the BIA actually engaged in the analysis under Matter of W-Y-C-, which requires comparing the PSGs at issue to determine if they are substantially similar.

But we do not need to decide if the BIA conducted the necessary legal analysis or if that analysis was correct because, as we have concluded, the BIA misunderstood Ferreira's original PSG. Thus, at best, it compared the PSG of "Trinidadian women" to a PSG that Ferreira never advanced. Accordingly, should Ferreira continue to offer this alternative iteration on remand, the BIA should evaluate whether "Trinidadian women" is substantially similar to Ferreira's original gender-based PSG, as correctly formulated, before refusing to consider it.

## III. CONCLUSION

For all of these reasons, we **grant** the petition in part, **vacate** in part, and **remand** for proceedings consistent with this opinion.