# Matter of E-A-, Applicant

*Decided September 11, 2012*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)   In assessing whether there are serious reasons for believing that an applicant for asylum or withholding of removal has committed a serious nonpolitical crime, an Immigration Judge should balance the seriousness of the criminal acts against the political aspect of the conduct to determine whether the criminal nature of the acts outweighs their political character.

(2)   When considered together, the applicant's actions as a member of a group that burned passenger buses and cars, threw stones, and disrupted the economic activity of merchants in the market, while pretending to be from the opposition party, reached the level of serious criminal conduct that, when weighed against its political nature, constituted a serious nonpolitical crime.

FOR APPLICANT:  Michael Lehach, New York, New York, Esquire

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Megan A. Berry, Associate Legal Advisor

BEFORE:  Board Panel:  GRANT, MALPHRUS, and MULLANE, Board Members.

MALPHRUS, Board Member:

The applicant has appealed from a decision of the Immigration Judge dated November 17, 2008, denying his applications for asylum and withholding of removal under sections 208(b)(1) and 241(b)(3)(A) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(b)(1) and 1231(b)(3)(A) (2006), and for protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").  The Immigration Judge determined that the applicant had committed a serious nonpolitical crime in Cote d'Ivoire prior to arriving in the United States, which rendered him ineligible for the requested relief pursuant to sections 208(b)(2)(A)(iii) and 241(b)(3)(B)(iii) of the Act and 8 C.F.R. § 1208.16(d)(2) (2012).  The appeal will be dismissed.

## I.  FACTUAL AND PROCEDURAL HISTORY

The applicant, a native and citizen of Cote d'Ivoire, arrived in the United States on January 14, 2000, as a stowaway and claimed that he feared being returned to his country.  His case was referred to an Immigration Judge.[1]

In immigration proceedings, the applicant testified that he was a member of the youth group of the Democratic Party of Cote d'Ivoire ("PDCI") and was employed as a driver for the PDCI from 1994 to 1999.  The applicant said that in 1994, while the PDCI controlled the Government, he was among a group of members who were sent "to make trouble" at events of the opposition party, the Ivoirian Popular Front ("FPI"), in an attempt to "taint the image" of the FPI among the general public.  He and others in the group dressed in a manner similar to members of the FPI and intermingled among them at public FPI demonstrations.

On five or six occasions in 1994, the applicant participated as a member of this group while it burned passenger buses and cars, threw stones, pushed baskets of food off the heads of merchants as they walked on the streets, and threw merchandise off of merchants' tables in the market.  He testified that no one was ever hurt as a result, even when they set fire to the buses and parked cars.  He explained that they would force the buses to stop by constructing roadblocks of wood and then require the passengers to exit before setting the vehicles on fire, always making sure no one was left inside. The applicant also stated that he was afraid he would lose his job with the party if he refused to participate.

The applicant argues that his actions in Cote d'Ivoire did not rise to the level of a serious nonpolitical crime as contemplated by sections 208(b)(2)(A)(iii) and 241(b)(3)(B)(iii) of the Act.  He asserts that the Immigration Judge erred in finding that the political intentions of his actions were outweighed by their criminal or common law nature, claiming that his conduct consisted of minor acts of vandalism that were engaged in solely for a political purpose.

---

[1] The Immigration Judge initially denied the applicant's applications for relief in a decision dated November 30, 2000.  The applicant's appeal was dismissed by the Board on March 13, 2002.  The proceedings were subsequently reopened, further testimony was taken in 2003, and the Immigration Judge issued a decision on March 4, 2004, again denying the requested relief.  We summarily affirmed that decision on October 20, 2005.  Upon petition for review, the United States Court of Appeals for the Third Circuit granted the applicant's petition and remanded for the Board to analyze whether the applicant had committed a serious nonpolitical crime in Cote d'Ivoire and to consider the question of changed country conditions.  *Ehoan v. Att'y Gen. of  U.S.*, 209 F. App'x 103 (3d Cir. 2006).  On August 13, 2007, we remanded the record to the Immigration Judge for further proceedings.

## II.  ANALYSIS

### A.  Legal Standard

Under the Act, an alien is barred from obtaining asylum and withholding of removal when "there are serious reasons for believing that the alien committed a serious nonpolitical crime" before arriving in the United States.  Section 208(b)(2)(A)(iii) of the Act (asylum); *see also* section 241(b)(3)(B)(iii) (withholding of removal).  We have explained that "[i]n evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common law character.  This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." *Matter of McMullen*, 19 I&N Dec. 90, 97-98 (BIA 1984), *aff'd*, 788 F.2d 591 (9th Cir. 1986).

Thus, we first consider whether the criminal conduct is of "an atrocious nature." *Id.* at 98.  If not, we balance the seriousness of the criminal acts against the political aspect of the conduct to determine whether the criminal nature of the applicant's acts outweighs their political character. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 429-31 (1999).

An analysis of the political nature includes an assessment whether (1) the act or acts were directed at a governmental entity or political organization, as opposed to a private or civilian entity; (2) they were directed toward modification of the political organization of the State; and (3) there is a close and direct causal link between the crime and its political purpose. *See McMullen v. INS*, 788 F.2d 591, 597-98 (9th Cir. 1986), *overruled on other grounds by Barapind v. Enomoto*, 400 F.3d 744, 751 n.7 (9th Cir. 2005); *see also Efe v. Ashcroft*, 293 F.3d 899, 905 (5th Cir. 2002).  "Even in a case with a clear causal connection, a lack of proportion between means and ends may still render a crime nonpolitical." *INS v. Aguirre-Aguirre*, 526 U.S. at 432; *see also Efe v. Ashcroft*, 293 F.3d at 906 (finding that killing a police officer at a political demonstration was a serious nonpolitical crime because the conduct was disproportionate to the political objectives).  The evaluation of a serious nonpolitical crime is conducted on a case-by-case basis considering the facts and circumstances presented.

We interpret "serious reasons for believing" to be equivalent to probable cause, as have the circuit courts that have considered this question. *Go v. Holder*, 640 F.3d 1047, 1052 (9th Cir. 2011); *Khouzam v. Ashcroft*, 361 F.3d 161, 165-66 (2d Cir. 2004).  In this case it is undisputed that the applicant's testimony during the immigration hearing was sufficient to establish probable cause to believe that he was involved in the criminal conduct at issue. *See Go v. Holder*, 640 F.3d at 1053; *Guo Qi Wang v. Holder*, 583 F.3d 86, 91 (2d Cir. 2009); *see also Efe v. Ashcroft*, 293 F.3d at 905-06.

## B. Application of the Legal Standard

The applicant testified that he and others in his group threw stones, burned buses and cars, pushed baskets off the heads of merchants, and threw merchandise off merchants' tables. The actions described by the applicant include crimes generally recognized in the United States as assault, aggravated assault, recklessly endangering another person, terroristic threats, arson, and criminal mischief. *See* Model Penal Code §§ 211.1–.3, 220.1, 220.3 (Westlaw through 2011).

However, the conduct was not solely criminal in nature and was not designed simply to terrorize the public. Instead, it had some political character and motive, because by appearing to be members of the FPI, the PDCI group intended to tarnish the image of the opposition in the minds of the public and help prevent the opposition from coming to power. *See Berhane v. Holder*, 606 F.3d 819, 823 (6th Cir. 2010) (stating that throwing rocks at the police in a show of force in opposition to the ruling government and in support of the opposition party's principles established a political motive). Thus, contrary to the DHS's argument, this is not a case where the criminal scheme had no political aspect or political objective. *INS v. Aguirre-Aguirre*, 526 U.S. at 429.

We agree with the applicant that the conduct in this case does not involve acts of an "atrocious nature" such as murder or terrorism. *Cf. Matter of McMullen*, 19 I&N Dec. at 98 (noting that terrorism in the form of random bombings of civilian targets is widely viewed as atrocious in nature). *See generally Khouzam v. Ashcroft*, 361 F.3d at 166 (holding that the applicant had committed a serious nonpolitical crime where there was reason to believe he committed a murder in Egypt).

However, weighing the seriousness of the criminal conduct against its political nature, we conclude that the applicant's criminal conduct was disproportionate to its political character and that he therefore committed a serious nonpolitical crime. Some of the acts, such as throwing rocks, would not alone meet the definition of a serious nonpolitical crime. But when considered together with the applicant's other actions, particularly the burning of buses and cars, the activity reaches the level of serious criminal conduct that would trigger the bar under sections 208(b)(2)(A)(iii) and 241(b)(3)(B)(iii) of the Act.[2]

---

[2] The weighing is a much easier task when there is no clear political motive to serious criminal conduct. *See Guo Qi Wang v. Holder*, 583 F.3d at 91 (noting that there is no indication that the applicant's scheme to harvest and sell organs of deceased inmates had any political aspect or political objective); *Go v. Holder*, 640 F.3d at 1052 (noting that the applicant did not show that his drug trafficking offense had some political aspect or political objective).

The conduct in this case is similar to the aggregate actions found to constitute a serious nonpolitical crime in *INS v. Aguirre-Aguirre*. There the alien and others within his group of party members burned buses, broke windows, assaulted police, and attacked police cars in protest against government policies and actions. *INS v. Aguirre-Aguirre*, 526 U.S. at 421-22. Before setting fire to the buses, they ordered the passengers to leave, and those who refused were assaulted or tied with ropes. *Id*. The Supreme Court affirmed the Board's conclusion "that the violence and destructiveness of the crimes, and their impact on civilians, were disproportionate to [their] acknowledged political objectives." *Id*. at 431.

The primary difference in this case and *INS v. Aguirre-Aguirre* is that the applicant testified that the group never caused physical injury to anyone, including the civilians removed from buses. However, serious physical harm to civilians is not required for a finding of a serious nonpolitical crime. Even if all the passengers were removed from the vehicles unharmed, this does not in itself undercut the serious nature of the crimes.

We consider not only what actually resulted from the fires, but also the danger and risk that is inherent in acts of arson. The burning of transit vehicles and private cars on public streets after forcing out the occupants was highly dangerous conduct that placed innocent people at substantial risk of death or serious bodily injury. *See generally United States v. Farish*, 535 F.3d 815, 825 (8th Cir. 2008) (stating that for purposes of the Sentencing Guidelines, starting fires in homes created a substantial risk of death or serious bodily injury to people, even though no one was inside at the time or was actually injured by the fires). The fact that civilians were placed at risk of serious harm is a significant consideration in our analysis. *See Matter of McMullen*, 19 I&N Dec. at 98 (viewing "the civilian status of the victims as significant").[3]

Moreover, the PDCI group's destructive behavior would very likely be disruptive to the day-to-day living and economic activity of the public at large in a country such as Cote d'Ivoire, which has a challenging economic climate and where a large informal sector of the economy consists of many small farms, roadside and street side shops, and urban workshops. See, e.g., the

---

[3] We have also found burglary and robbery to be serious nonpolitical crimes. *See Matter of Ballester-Garcia*, 17 I&N Dec. 592, 595-96 (BIA 1980), *modified on other grounds*, *Matter of Gonzales*, 19 I&N Dec. 682, 685 n.3 (BIA 1988); *Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 469-70 (BIA 1980), *modified on other grounds*, *Matter of Gonzales*, 19 I&N Dec. 682, 685 n.3 (BIA 1988). It is relevant in assessing the serious criminal nature of these offenses that they are not simply minor property offenses but, instead, involve a substantial risk of violence and harm to persons.

Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Cote d'Ivoire Country Reports* for Human Right Practices – 2006 (March 6, 2007), *available at* http://www.state.gov/j/drl/rls/hrrpt/2006/78730.htm, included in the record of proceedings. In Cote d'Ivoire it would be much more difficult to replace the property that was damaged, including buses and personal vehicles, than in, for example, the United States or Canada, and the economic and psychological impact of the loss on the public would have been significantly more detrimental. *See generally INS v. Aguirre-Aguirre*, 526 U.S. at 421 (noting that "the amount of bus fare represents a significant portion of many Guatemalans' annual living expense, and a rise in fares may impose substantial economic hardship").

While the PDCI group's conduct had an overall political objective of damaging the reputation of the opposition party, its disruptive acts were not directed at deterring oppressive action of a ruling governmental entity. For example, the group was not trying to prevent the Government from disrupting an opposition political rally. Instead, the harmful acts were aimed at members of the general public, who did not appear to be allied with any particular political party.

In addition, the group's method of attempting to taint the reputation of the FPI party is not a typical form of political activity that would likely have a clear, direct impact, so the political character of the group's activity is lessened. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 754-55 (8th Cir. 2004) (affirming an Immigration Judge's finding of a serious nonpolitical crime where the applicant "was involved in burning buses which served the civilian population," because although the protests involved political issues, "burning civilian buses was not a direct attack upon government activities"). Although the criminal conduct here was similar to that in *INS v. Aguirre-Aguirre*, the link between the crime and the political purpose is less clear and direct. In that case, the protests were in direct opposition to specific government policies regarding the cost of public transportation in an impoverished nation. The "political" action of the PDCI group was simply to try to discredit the FPI party in the minds of the public by engaging in deceptive misconduct that the group hoped would be attributed to the opposing party.

The applicant argues that his actions cannot be considered a serious crime because he should only be held responsible for pushing merchandise off the heads of merchants, which is all that he admitted to personally engaging in during the last hearing on March 13, 2008. However, this is not consistent with the Immigration Judge's 2008 decision, where she found that he "participated" in all of the activities. Specifically, she stated: "In prior testimony [in May 2003], Applicant admitted that he threw stones, burned buses and cars, pushed baskets off the heads of merchants, and threw

merchandise off merchants' tables. During testimony at the March 13, 2008 hearing, the applicant testified again he participated in these activities." She then assumed for the sake of argument that he participated in these activities only five or six times in total, as he had admitted in 2008, as opposed to over a 5- to 6-year period, as he had testified during the prior hearing in 2003. She did not change any other factual findings, including her prior determination that he had personally engaged in all of the activities.[4] Moreover, the applicant has not shown that the Immigration Judge's factual findings are clearly erroneous.

In any event, the applicant was not a mere bystander during these events and was not simply a group member who was absent and disengaged from these activities while they were being perpetrated.[5] His involvement and participation in the group's criminal acts materially contributed to its ability to accomplish the destructive behavior.

Additionally, we are unpersuaded by the applicant's claims that he was forced to assist in these acts because he was being watched by party leaders. *See Urbina-Mejia v. Holder*, 597 F.3d 360, 369 (6th Cir. 2010) (affirming the finding that the applicant was not coerced into committing serious nonpolitical crimes as a member of a gang while a juvenile).[6] His claimed fear of losing his job or being thrown in prison if he did not participate was speculative and

---

[4] The applicant changed his testimony in 2008, not only as to the number of times he participated in the group's conduct, but also as to the extent of his direct personal involvement in its activities. Specifically, in 2003 he said he put wood on the road and set fire to the buses. But he later changed his testimony to say that he did not personally "set fire to a bus," although he continued to admit that he "was part of the group who was burning" buses. The applicant's only explanation for this change was a general assertion that the interpretation of his prior testimony must have been erroneous. However, the Immigration Judge was not required to adopt that explanation. *See Matter of D-R-*, 25 I&N Dec. 445, 455 (BIA 2011). This is especially true here because the Immigration Judge had the interpretation in the prior transcript evaluated for accuracy and concluded that it was correct. Moreover, the evidence only need establish probable cause to conclude that the applicant engaged in these activities. This is not a high threshold, and it was clearly met based on his 2003 testimony.

[5] As noted, the applicant claimed in his 2008 testimony that he did not personally "set fire to a bus," but he still conceded that he "was part of the group who was burning" buses and said he was "present" and "in the group" of "people doing this" to buses, as well as to cars.

[6] The analysis of the criminal nature of the applicant's conduct could be different if the facts indicated that he was acting in self-defense by, for example, fighting back when beaten by police during a political demonstration. *See Berhane v. Holder*, 606 F.3d at 825; *cf. Efe v. Ashcroft*, 293 F.3d at 906 (rejecting the claim of self-defense, which was belied by the fact that the applicant left a demonstration, found a knife at a house, and returned to kill an officer). However, self-defense is not an issue in this case.

not based on any specific, credible threat or any evidence that such actions had been carried out on others similarly situated to him. The applicant's generalized fear is not sufficient to show that he would have suffered any dire consequences, such as serious physical harm or economic persecution, if he had refused to participate in the group. Moreover, his expressed concern over losing his employment with the party if he did not participate in the crimes indicates an economic motivation, which further undermines the extent of the political nature of his conduct.

Finally, the applicant's claim that he has a well-founded fear of persecution is not a factor in determining whether he has committed a serious nonpolitical crime. *INS v. Aguirre-Aguirre*, 526 U.S. at 425-28. It is the political nature of the activity, not the risk of persecution, that is balanced against the alien's criminal conduct. *Id.*; *see also Matter of Rodriguez-Coto*, 19 I&N Dec. 208, 209-10 (BIA 1985), *modified on other grounds*, *Matter of Gonzales*, 19 I&N Dec. 682, 685 n.3 (BIA 1988). Moreover, a serious nonpolitical crime analysis under the Act is not governed by the provisions of the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1992). *INS v. Aguirre-Aguirre*, 526 U.S. at 427-28; *see also Matter of Q-T-M-T-*, 21 I&N Dec. 639, 649-50 & n.5 (BIA 1996) (noting that the *Handbook* is advisory but is not binding).

## III. CONCLUSION

In summary, our inquiry in this case is whether the applicant's criminal conduct is disproportionate to, and thus outweighs, its political nature. *INS v. Aguirre-Aguirre*, 526 U.S. at 430-31. We conclude that there was some political character to the applicant's conduct. As a member of a PDCI group, he burned passenger buses and cars, threw stones, and disrupted the economic activity of merchants in the market, while pretending to be members of the FPI party, in an attempt to discredit the opposition political party. Although there were some political aspects to these actions, they were also, in fact, crimes against persons and property. When considered separately, many of these individual acts would not reach the level of a serious nonpolitical crime. However, the circumstances and cumulative effect of the multiple violent, destructive, and destabilizing acts, particularly the intentional acts of arson that placed innocent civilians at risk of serious harm, are sufficient to trigger the serious nonpolitical crime bar.

Each case must be viewed based on its own facts, and we consider the circumstances of this case to be at the outer limits of what would constitute a serious nonpolitical crime. But based on the totality of the record, we agree

with the Immigration Judge that the criminal nature of the applicant's conduct outweighs its political character. *INS v. Aguirre-Aguirre*, 526 U.S. at 428-30. We therefore conclude that the applicant is ineligible for asylum, withholding of removal, and withholding under the Convention Against Torture. Sections 208(b)(2)(A)(iii), 241(b)(3)(B)(iii) of the Act; 8 C.F.R. § 1208.16(d)(2).

An alien who is found to have committed a particularly serious crime is not precluded from seeking deferral of removal under the Convention Against Torture. *See* 8 C.F.R. § 1208.17 (2012). In remanding this case, the Third Circuit determined that substantial evidence in the record supported the Immigration Judge's finding on March 3, 2004, that the Cote d'Ivoire Government would not likely torture the applicant or acquiescence in his torture. During oral argument, the applicant withdrew this application, conceding that current country conditions in Cote d'Ivoire would not support a grant of relief on this basis.

Accordingly, the applicant's appeal will be dismissed.

**ORDER:**  The appeal is dismissed.