# United States Court of Appeals
## For the First Circuit

No. 24-1280

AKEISH JOHNIOY MORGAN,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Gelpí and Rikelman, Circuit Judges,
and Katzmann,[*] Judge.

---

SangYeob Kim, with whom Gilles Bissonnette and American Civil Liberties Union of New Hampshire were on brief, for petitioner.

Matthew A. Spurlock, Trial Attorney, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Acting Assistant Attorney General, Civil Division, and Brianne Wheelan Cohen, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

---

November 5, 2024

---

[*] Of the United States Court of International Trade, sitting by designation.

**KATZMANN**, <u>Judge</u>. Petitioner Akeish Johnioy Morgan ("Morgan") is a national and citizen of Jamaica who illegally entered the United States without inspection on June 11, 2022. Some two weeks prior, on May 27, 2022, a Jamaican justice of the peace had issued a warrant for his arrest for the charges of murder, unlawful possession of a firearm, and wounding with intent to do grievous bodily injury. Morgan now seeks our review of an order by the Board of Immigration Appeals ("BIA") dismissing his appeal from an Immigration Judge's ("IJ") denial of his applications for asylum, statutory withholding of removal ("Statutory Withholding"), and relief (both withholding ("CAT Withholding") and deferral ("CAT Deferral") of removal)[1] under the

---

[1] Asylum, withholding of removal, and deferral of removal are distinct forms of relief. As between asylum and withholding of removal, we have explained that "they afford aliens distinct types of benefits. In particular, asylum, though obtainable upon a less-demanding showing, 'affords broader benefits' to the recipient than does withholding of removal." <u>Garcia</u> v. <u>Sessions</u>, 856 F.3d 27, 32 (1st Cir. 2017) (quoting <u>INS</u> v. <u>Cardoza-Fonseca</u>, 480 U.S. 421, 428 n.6 (1987)). As between withholding and deferral, the Fourth Circuit has explained as follows:

> An important difference between withholding of removal and deferral of removal is the ease in which the deferral may be terminated. To terminate withholding of removal, the government must move to reopen the case, meet the standards for reopening, and establish by a preponderance of the evidence that the alien is no longer eligible for withholding. In contrast, the regulations provide a streamlined termination process for deferral of removal.

<u>Turkson</u> v. <u>Holder</u>, 667 F.3d 523, 525 n.1 (4th Cir. 2012).

U.S. regulations implementing the Convention Against Torture ("CAT"). The IJ determined Morgan to be ineligible for asylum, Statutory Withholding, and CAT Withholding because of the warrants issued against him in Jamaica. The BIA affirmed this determination, concluding that these warrants, alongside other supporting evidence, barred Morgan's eligibility for non-CAT Deferral relief as there were "serious reasons for believing that the respondent committed a serious nonpolitical crime before arriving in the United States."

The BIA also affirmed the IJ's determination that Morgan was ineligible for CAT Deferral because (1) the beatings that Morgan claimed to have suffered at the hands of police in Jamaica did not constitute past torture and because (2) Morgan failed to demonstrate a sufficient likelihood that he would be tortured upon his removal to Jamaica.

We conclude that the agency's[2] serious-nonpolitical-crime finding is supported by substantial evidence, and accordingly sustain its determination that Morgan is ineligible for asylum, Statutory Withholding, and CAT Withholding. But the agency's likelihood-of-future-torture finding, which forms the basis of its determination that Morgan is ineligible for CAT

---

[2] "When discussing the BIA and IJ's decisions as a unit, we refer to them jointly as 'the agency.'" Ferreira v. Garland, 97 F.4th 36, 46 (1st Cir. 2024). We use more specific references where appropriate.

Deferral, rests on an erroneously narrow legal definition of torture. We accordingly grant Morgan's petition insofar as it pertains to the CAT Deferral determination, and remand to the BIA to make a likelihood-of-future-torture determination that accounts for the proper definition.

## I.

Morgan entered the United States via Mexico on June 11, 2022. He was arrested on April 14, 2023, in Hartford, Connecticut, by officers of U.S. Immigration and Customs Enforcement ("ICE") and charged with alien inadmissibility. See generally 8 U.S.C. § 1182. Morgan, with the assistance of counsel, conceded removability in a written pleading but applied for relief from removal in the forms of asylum, Statutory Withholding, and CAT Withholding.

In an affidavit he submitted with his application for these forms of relief, Morgan stated that he was "wanted for murdering" a person in Jamaica who was affiliated with an organization called the "Bus Head Gang" (the "Gang"). This, he maintained, was a "trap from the Government of Jamaica, and the police against me." Morgan acknowledged that a murder had occurred, but claimed he was in a different area at the time it took place. In the application itself, he stated that "[t]he Government of Jamaica wants to put me in jail[ ]and get killed by [political party-affiliated] gang members in jail" and that "I am

-4-

being framed because the government would like to torture me." Morgan's affidavit recounted a series of threats and assaults against him and his family by gang members and gang-affiliated local police officers in Jamaica.[3]

Morgan was taken into ICE custody pending the outcome of his removal proceeding on account of what the Department of Homeland Security ("DHS") stated was "the risk to public safety due to the underlying conduct of the . . . Jamaican criminal arrest warrant." Morgan appeared before the IJ four times between May and November of 2023, and he was represented by counsel on each of these occasions. Morgan testified on his own behalf during the third of these appearances, which took place on October 10, 2023.

### A. Morgan's Presentation Before the IJ

In his testimony before the IJ, Morgan elaborated on the facts he recounted in the affidavit he submitted with his application for relief from removability. He testified that when

---

[3] In this affidavit, Morgan asserted a greater degree of active cooperation between the police and the gang than what he later asserted in his testimony before the IJ. For example, he stated in the affidavit that on January 1, 2022, he was assaulted by the same policeman to whom he had earlier that day reported that a different officer was cooperating with the local gang -- and that the officer who was the subject of this report was also present on the scene of the assault. But in his testimony, which is summarized below, Morgan made no reference to the identities of the officers who assertedly assaulted him. The IJ directly asked him, "[a]nd these were police officers? Who were these people?" But instead of identifying the officers, as he had in the affidavit, Morgan stated that "[t]hey are police officers" who are "not in the best interest of the, of the law abiding citizens."

-5-

he was living in Jamaica, he and his family suffered mistreatment at the hands of both Jamaican law enforcement and the Gang, a politically affiliated but extrajudicial armed group. This claimed mistreatment falls into three categories: direct mistreatment by law enforcement, direct mistreatment by the Gang, and acquiescence by law enforcement to direct mistreatment by the Gang. Morgan presented the following narrative in his testimony:

When Morgan was living in Jamaica, the Jamaican Labor Party ("JLP") outfitted and "sent" members of the Gang to Roaring River, the area where Morgan lived, in order to "force the voters to vote for the JLP." The Gang, led by a man named Odene[4] Marshall, would "terrorize people and extort people." The Gang began targeting members of Morgan's family in 2019. Gang members "terroriz[ed]" Morgan's brother Oquive, who is gay, and who also refused to "pay [the Gang] to live in the community." A Gang member named Kilipe shot and injured Morgan's cousin Calvin in order to "send a message to Oquive."

On one occasion, the members of the Gang assaulted Morgan himself. Two Gang members, including Marshall, approached Morgan outside of a supermarket and repeatedly hit him. During the beating, the attackers issued verbal threats to Oquive, who was

---

[4] The spelling of this name varies throughout the record. We refer to Marshall by his last name in the remainder of this opinion.

-6-

not at the scene, on account of his sexual orientation. After the assault, Morgan went to a hospital, where he received stiches to his head and was treated for a fractured skull.

Morgan reported the assault to the local police, describing to them the identities of his assailants. But although the police made verbal promises to investigate further, they did not meaningfully respond. Then, after a further attack by the Gang on Oquive, Morgan's family contacted the Jamaica Defense Force to seek protection from the Gang. The police, however, informed the Gang of this communication. The Gang retaliated by assaulting two of Morgan's cousins and Morgan's fiancée. The Gang also poisoned Morgan's family's livestock.

Then, on January 1, 2021, police officers holding "long guns" attacked and threatened Morgan during a traffic stop. After ordering Morgan to exit his car, they beat him with their guns and a baton. They said (in Morgan's words) that "they want to kill me right here." One of the officers ripped off one of Morgan's earrings, tearing Morgan's left ear. The officers warned Morgan against reporting the assault to other law enforcement, and attempted to extort Morgan, stating that Morgan "should pay [his] dues or leave the community as soon as possible." In addition to the injury to his ear, Morgan received injuries to his shoulder and knees, which Morgan testified were still apparent at the time of the removal hearing.

After what Morgan testified was a further apparent threat against him by an unidentified gunman on a farm in Roaring River, Morgan left Jamaica for the United States on June 6, 2022.

In addition to providing the narrative set forth above, Morgan submitted letter affirmations from family members and acquaintances in support of his applications for relief. Several witnesses, including Morgan's brother, sister, fiancée, sister-in-law, and friend, also testified on behalf of Morgan.

## B. The IJ's Decision

The IJ denied Morgan's applications for all the forms of relief he primarily sought: asylum, Statutory Withholding, and CAT Withholding. She denied these applications on account of evidence, submitted by DHS, that Morgan committed certain serious nonpolitical crimes while still in Jamaica. The submitted documents implicate Morgan in a shooting attack in Jamaica on May 26, 2022, during which a man named Oneil Rodney was killed[5] and Marshall was injured. They include two DHS I-213 forms, dated April 13 and June 13, 2023, that together detail Morgan's arrest in Hartford, Connecticut, as well as his status as a fugitive from criminal prosecution in Jamaica. They also include three Jamaican warrants on information for Morgan's arrest, one for each charged

---

[5] During his testimony, Morgan identified the man who was killed in this attack as Kilipe, who Morgan claimed shot his cousin Calvin Cunningham.

offense ("the Warrants"), which were issued on May 27, 2022, by a justice of the peace in Westmoreland, Jamaica.

DHS also submitted a Jamaican police report dated March 20, 2023 (the "Police Report"), which details the death by shooting of Rodney and the injury by shooting of Marshall on May 26, 2022. The Police Report names Morgan as one of four suspects and notes that he is a fugitive, although it does not precisely describe the basis of this identification. It identifies an eyewitness and states, in part, as follows:

> The scene was visited by Inspector B. Gentle and other Police personnel from Savanna-la-mar and Whithorn Police Station and processed by Detective Corporal C. Hamilton assigned to the Are 1 Technical Services Division where Eleven (11) 9mm spend [sic] casings, two expended bullets, one damaged bullet and five blood samples were retrieved. Consequently Warrants on Information were prepared for all four men.

Finally, DHS presented a brief Jamaican press report detailing the shooting attack, which does not identify Morgan by name.

Having denied Morgan's applications for asylum, Statutory Withholding, and CAT Withholding, the IJ proceeded to consider Morgan's eligibility for CAT Deferral. The IJ concluded that Morgan, even here, did not meet "his burden of establishing [that] he more likely than not would face torture if returned to Jamaica."

-9-

## C. Morgan's BIA Appeal

Morgan appealed the IJ's decision to the BIA. In his brief before the BIA, he argued that the IJ's serious-nonpolitical-crime determination relied on evidence that was insufficient to establish probable cause. Morgan also argued that the IJ's determination of his ineligibility for CAT Deferral was erroneous. Specifically, he contended that the IJ ignored evidence of Morgan's "past persecution by the gang and by the police officers," and that "the IJ did not refer to the record evidence that supportably shows that Morgan and his family were issued death threats by the gang and its affiliates." Finally, Morgan argued that the IJ failed to provide Morgan with an opportunity to corroborate his and his supporting witnesses' testimony, and that the IJ's adverse credibility determination as to elements of that testimony was therefore erroneous.

The BIA dismissed Morgan's appeal in an opinion issued by a single Appellate Immigration Judge. As to the serious-nonpolitical-crime bar, the BIA explained that Morgan did "not present[] sufficient persuasive evidence to contradict the evidence presented by DHS." The BIA further reasoned that the Warrants were "sufficient to establish probable cause" and that Morgan had "not satisfactorily discredited" them. The BIA also affirmed the IJ's determination of Morgan's ineligibility for CAT Deferral. The BIA "agree[d] with the [IJ] that the one beating

[Morgan] sustained by the police did not rise to the level of torture." The BIA further concluded that the IJ "permissibly concluded that the respondent and his family members' testimony about police acquiescence was not supported by objective evidence and therefore was insufficient to demonstrate that [Morgan] will be tortured with the consent or acquiescence of a public official in Jamaica." The BIA elaborated on this second conclusion, stating that the IJ "permissibly rejected [Morgan's] testimony and the testimony of his witnesses as self-interested as it pertained to the Jamaican police because [Morgan] did not provide sufficient objective corroborating evidence to support his assertions of corruption, particularly considering the outstanding warrant for his arrest."

This timely petition ensued.

## II.

We have jurisdiction to hear this petition for review under 8 U.S.C. § 1252.

We review the agency's findings of fact and credibility against a substantial evidence standard, Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020), under which we "will only disturb the agency's findings if, in reviewing the record as a whole, any reasonable adjudicator would be compelled to conclude to the contrary," Barnica-Lopez v. Garland, 59 F.4th 520, 527 (1st Cir. 2023) (internal quotation marks and citation omitted); see also 8

-11-

U.S.C. § 1252(b)(4)(B). "[W]e review legal conclusions de novo . . . ." Varela-Chavarria v. Garland, 86 F.4th 443, 449 (1st Cir. 2023).

In the decision presented for review, "the BIA did not say that it was adopting the IJ's decision, only that the IJ's findings were not clearly erroneous." Aguilar-Escoto v. Garland, 59 F.4th 510, 519 (1st Cir. 2023). While we therefore "focus our review on the BIA's decision," id., we address the elements of the IJ's decision that supply necessary context.

**III.**

Morgan challenges the agency's determinations that (a) he is ineligible for asylum, Statutory Withholding, and CAT Withholding because there exist serious reasons to believe that he committed a serious nonpolitical crime and that (b) he is ineligible for CAT Deferral.

**A. The Serious Nonpolitical Crime Determination**

We first address Morgan's challenge to the agency's serious-nonpolitical-crime determination. A determination that an applicant committed a serious nonpolitical crime precludes eligibility for asylum, Statutory Withholding, and CAT Withholding. 8 U.S.C. §§ 1158(b)(2)(A), 1231(b)(3)(B). The IJ and the BIA may determine as much only if "there are serious reasons for believing that the alien has committed a serious

-12-

nonpolitical crime outside the United States." Id. § 1158(b)(2)(A)(iii); see also id. § 1231(b)(3)(B)(iii).

Here, there exist "serious reasons," under even a narrow interpretation of that statutory phrase, to believe that Morgan committed the crimes with which he was charged in Jamaica. It is not so, furthermore, that "any reasonable adjudicator would be compelled to conclude to the contrary." Barnica-Lopez, 59 F.4th at 527 (internal quotation marks and citation omitted). The "serious reasons" undermining Morgan's asylum and Withholding claims are apparent from the DHS documents, as well as from Morgan's own removal-hearing testimony. Although these documents do not demonstrate the precise means by which Jamaican law enforcement came to identify Morgan as a suspect, the IJ reasonably "infer[red] from the narrative" that the eyewitness to the shooting attack identified Morgan as one of the four perpetrators.

In this case, in line with its established practice, the agency applied a probable-cause standard[6] as a means of

---

[6] Although our circuit has yet to rule on a challenge to this interpretation, all other circuits that have taken up the question have either confirmed its lawfulness or held that it is a minimum standard under the statute. See, e.g., Whyte v. Garland, No. 22-1032, 2023 WL 3092977, at *3 (4th Cir. Apr. 26, 2023); Gonzalez-Castillo v. Garland, 47 F.4th 971, 976–77 (9th Cir. 2022) (quoting Go v. Holder, 640 F.3d 1047, 1052 (9th Cir. 2011)); Barahona v. Garland, 993 F.3d 1024, 1025 (8th Cir. 2021); Khouzam v. Ashcroft, 361 F.3d 161, 165 (2d Cir. 2004). Because no party challenges the agency's application of the probable-cause standard here, we have no occasion to pass on its lawfulness under 8 U.S.C. §§ 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii).

effectuating the statutory "serious reasons to believe" directive. See Matter of E-A-, 26 I. & N. Dec. 1, 3 (BIA 2012). Morgan does not challenge the use of this standard, which in the context of U.S. criminal law requires a showing of a "fair probability." Illinois v. Gates, 462 U.S. 213, 238 (1983).[7] In this circuit, "[p]robable cause does not require either certainty or an unusually high degree of assurance." United States v. Clark, 685 F.3d 72, 76 (1st Cir. 2012) (citing United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999)). And "[a] finding of probable cause can be supported by less evidence than is required to support a conviction, and not all plausible lawful explanations of the situation must be negated." United States v. White, 766 F.2d 22, 25 (1st Cir. 1985) (internal citation omitted).

---

[7] The BIA's use of the probable-cause standard as a means of conducting the "serious reasons" inquiry appears to import caselaw pertaining to U.S. criminal law outside the immigration context. See Matter of E-A-, 26 I & N Dec. at 3 (favorably citing Go, 640 F.3d at 1053, in which the Ninth Circuit in turn cited non-immigration probable-cause caselaw as a basis for sustaining the BIA's serious-reasons determination); see also Silva-Pereira v. Lynch, 827 F.3d 1176, 1189 (9th Cir. 2016) (indirectly quoting the "fair probability" benchmark laid out in Gates, 462 U.S. at 214, in assessing the existence of "serious reasons" under 8 U.S.C. §§ 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii)). While we similarly turn to our circuit's caselaw on probable cause outside the immigration context, we do so only to facilitate proper review of the agency's "serious reasons" analysis -- for which "probable cause" is the agency's stated benchmark. We offer no view on the uncontested preliminary question of whether the agency's use of this benchmark is lawful.

The agency properly determined that the evidence submitted by DHS of Morgan's criminal conduct meets the probable-cause standard. Taken together, the Warrants, the Fugitive Arrest Form, the Police Report establish at least a "fair probability" that Morgan committed the charged[8] murder (as well as the other charged crimes). Gates, 462 U.S. at 214.

Morgan argues that "the details of these documents do not independently establish probable cause." The Police Report, he asserts, "does not explain how Petitioner was identified as one of the assailants," and provides "no explanation" as to how the Jamaican police used the blood samples, casings, and bullets to implicate him in the murder. Morgan also argues that it would have been "logically" difficult for the eyewitness cited in the Police Report to have identified Morgan as one of the assailants from the hiding place that she seemingly occupied during the shooting incident. He also states that "there is no indictment," implying without asserting that under Jamaican law an information is a less inculpatory charging instrument than an indictment.

Morgan demands a level of rigor that the probable-cause standard, as the agency employs it within the serious-nonpolitical-crime framework, does not require. It is

_____

[8] The Warrants were issued on an information, not an indictment. This fact is of unknown significance, however, as the record is silent on the subject of charging documents in the Jamaican legal system.

true that the record does not establish precisely how the Jamaican police came to identify Morgan as a suspect. But the absence of such a detail is not fatal to a finding of probable cause. In the United States legal system, at least, "probable cause determinations are to be informed by the totality of circumstances and not by the consideration of different pieces of evidence in isolation." United States v. Anzalone, 923 F.3d 1, 4 (1st Cir. 2019) (citing District of Columbia v. Wesby, 583 U.S. 48, 60 (2018)); see also Matter of E-A-, 26 I & N Dec. at 3 (incorporating the probable-cause standard into the statutory serious-reasons inquiry). The IJ and the BIA, faced with the existence of the Warrants and Police Report, as well as DHS's report that Morgan is a fugitive, were not required to conduct a granular inquiry into the individual sources on which the charging documents relied before concluding that "there are serious reasons to believe that [Morgan] committed a serious nonpolitical crime outside the United States." 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii).[9] As

---

[9] Morgan cites the Ninth Circuit case of Gonzalez-Castillo v. Garland, 47 F.4th 971, 977-78 (9th Cir. 2022), for the proposition that the Police Report, "on its face, would not meet the probable cause standard because it does not contain any specific information on how Petitioner was identified as one of the assailants." This reliance is misplaced. The relied-on INTERPOL "Red Notice" at issue in Gonzalez-Castillo lacked "allegations about the facts of Gonzalez-Castillo's [alleged criminal conduct], such as the identity of any victim or where he carried out a 'strike.'" Id. The Warrants and Police Report here, by contrast, appear to be more detailed. More importantly, the agency in this case was also

-16-

was the case in Telyatitskiy v. Holder, "[t]he record reveals that the IJ considered the totality of the evidence presented, even if it did not recite that evidence in all its detail." 628 F.3d 628, 631 (1st Cir. 2011).

In addition to the Warrants and Police Report, other record evidence further supported the agency's probable-cause determination. Such evidence includes Morgan's reported status as a fugitive and the timing of his departure from Jamaica. Morgan testified that he left Jamaica on June 6, 2022, which is just over one week after the May 26, 2022 shooting attack against Marshall and Rodney. The evidence also includes, as noted by the government in its presentation before the IJ, the existence of a motive for Morgan to harm Marshall and Rodney -- who, according to Morgan's testimony, were each responsible for assaults on Morgan and his family. See Silva-Pereira, 827 F.3d at 1189 (citing an asylum applicant's apparent motive for revenge as among evidence "certainly sufficient to constitute probable cause" in the context of a serious-nonpolitical-crime inquiry).

Morgan also argues that "under Jamaican law, the standard of arresting an individual is reasonable suspicion, not probable cause," and that "[t]hus, the issuance of the arrest

---

able to read them in conjunction with other pieces of evidence that together establish the "serious reasons" required under §§ 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii).

-17-

warrants in Jamaica was insufficient to satisfy the probable cause standard because the warrant applied a lower standard."  This argument implies that the agency's task in determining "probable cause" -- which in turn is a benchmark for "serious reasons" under §§ 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii) -- is simply to incorporate a foreign jurisdiction's standard-of-proof nomenclature.  Section 1158(b)(2)(A), however, specifies that the "Attorney General" is responsible for determining whether "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States."  The serious-reasons determination is thus the agency's alone to make.[10]  The label that a foreign jurisdiction applies to the standard for issuing a warrant does not replace this determination.  The agency's role is to independently assess the significance of a foreign warrant's issuance.  And in doing so, the agency may also consider other information related to the suspected crime.  See French v. Merrill, 15 F.4th 116, 125 (1st Cir. 2021) ("Probable cause is based on the totality of the facts and circumstances . . . .").

---

[10] The Attorney General delegates this power to the agency pursuant to 8 U.S.C. § 1103(g) and 8 C.F.R. pt. 1003; accordingly, § 1158(b)(2)(A)'s usages of the term "the Attorney General" refer to the agency.

Morgan lastly argues that "[e]ven if this Court finds that the arrest warrants and attached police affidavit constitute probable cause, the Court should find that the BIA and the IJ failed to meaningfully consider Petitioner's evidence establishing his innocence in applying the burden-shifting framework." Not so: As the government points out, Morgan failed to exhaust this argument -- or any analog thereof -- in his counseled presentation before the BIA. Thus, although it is true that an evidentiary indication that the serious-nonpolitical-crime bar "may apply" places the burden on Morgan to prove by a preponderance of the evidence that the serious-nonpolitical-crime bar does not apply, see 8 C.F.R. § 1240.8(d), Morgan cannot prevail on the basis of any error he asserts along these lines.

This exhaustion requirement reflects a statutory constraint on our consideration of Morgan's petition for review of the agency's final order of removal. See 8 U.S.C. § 1252(b). Under § 1252(d) of this judicial review provision, we "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." While this is not a jurisdictional limit, see Santos-Zacaria v. Garland, 598 U.S. 411, 419 (2023), the provision means that "theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order." Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004). And while in other

statutory contexts we might have more discretion to waive exhaustion, our discretion is limited here.  Cf. McCarthy v. Madigan, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required.  But where Congress has not clearly required exhaustion, sound judicial discretion governs." (citations omitted)), superseded by statute on other grounds. Congress has specifically mandated exhaustion here, even if this specific mandate does not take the form of an absolute jurisdictional bar.

## B. CAT Deferral

We next turn to the agency's determination that Morgan is ineligible for CAT Deferral.  Morgan's petition presents four alternative arguments that the BIA and the IJ improperly declined to find a more-than-fifty-percent likelihood of torture upon removal.  He argues that (i) the IJ and BIA applied an improperly narrow definition of torture in discounting evidence of Morgan's past treatment at the hands of the Jamaican police, that (ii) the BIA failed to address Morgan's claim that he suffered past torture by the Gang with the acquiescence of Jamaican law enforcement, that (iii) the BIA improperly rejected Morgan's claim that the Gang would torture him in the future with the acquiescence of Jamaican law enforcement, and did so based on an overly broad reading of the IJ's findings, and that (iv) the IJ and BIA

improperly rejected Morgan's assertion that he would likely be tortured by Jamaican officials upon his removal to Jamaica.

The first of these arguments is unexhausted, and the last of them is unpersuasive. But the second argument, which goes to the definition of acquiescence that the IJ and BIA applied, has merit. We remand to the BIA for further proceedings on its basis, and do not reach Morgan's third argument.

Before addressing the specifics of Morgan's CAT-related arguments, we summarize the relevant legal background.

If the serious-nonpolitical-crime bar applies, then Morgan's only remaining remedy is deferral (as distinct from withholding) of removal under the CAT. See 8 C.F.R. § 208.17(a). The CAT Deferral regulation provides that "[a]n alien who: has been ordered removed; has been found under [8 C.F.R.] § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured." Id. But "[t]o be granted deferral of removal under the CAT, the burden is on the petitioner" to make this showing. Ramírez-Pérez v. Barr, 934 F.3d 47, 52 (1st Cir. 2019).

To carry this burden, "[a] petitioner seeking CAT protection must show it is more likely than not that he would be

-21-

subject to torture by or with the acquiescence of a government official." Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014) (internal quotation marks and citation omitted); see also 8 C.F.R. § 208.18(a)(1) (restricting the definition of torture under the CAT to where "pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity"). "Acquiescence of a public official," in turn, "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). The regulation lists the following examples of "evidence relevant to the possibility of future torture":

> (i) Evidence of past torture inflicted upon the applicant;
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
> (iv) Other relevant information regarding conditions in the country of removal.

Id. § 208.16(c)(3). Finally, "[a]lthough past torture does not create a presumption of future torture, it is relevant to the question of whether the petitioner is more likely than not to face future torture." Hernandez-Martinez v. Garland, 59 F.4th 33, 40

-22-

(1st Cir. 2023) (first citing 8 C.F.R. § 208.16(c)(3); and then citing Romilus v. Ashcroft, 385 F.3d 1, 9 (1st Cir. 2004)).

With this background in place, we proceed to address Morgan's arguments that the agency erred in determining that he was ineligible for CAT Deferral.

### 1. Morgan Failed to Exhaust His Argument Regarding His Claim of Torture by the Jamaican Police Before the BIA.

In his opening brief, Morgan states that the IJ and the BIA "misapplied the standard of CAT protection" by failing to properly apply the regulatory definition of torture, which includes "any act by which severe pain or suffering, whether physical or mental," 8 C.F.R. § 208.18(a)(1), in determining that Morgan's January 1, 2021 encounter with the Jamaican police did not constitute torture. He challenges the IJ's conclusion that Morgan's description of the encounter was "insufficient for the Court to find that the respondent was in the past tortured by any government actor or any person acting under the color of law as the experience did not amount to an extreme form of cruel and degrading treatment rising to the level of torture," and also the BIA's "agree[ment] with the [IJ] that the one beating the respondent sustained by the police did not rise to the level of torture."

As the government points out, Morgan did not raise this particular challenge to the IJ's determination in his brief before

-23-

the BIA.  In that brief, Morgan cited 8 C.F.R. § 208.18(a)(1) as well as caselaw establishing that the infliction of mental pain or fear of imminent death may qualify as torture under the CAT.  See Romilus, 385 F.3d at 8.  But he invoked these authorities in support of a claim that he suffered torture at the hands of the Gang -- and not, as now presented in his petition brief, in support of a claim that he suffered torture directly at the hands of the Jamaican police in a specific roadside encounter on January 1, 2021.

Morgan listed several instances of torture by the Gang -- and of acquiescence thereto by the Jamaican police -- in his BIA brief.  He stated that the IJ erred in failing to consider evidence that he "was robbed several times at gunpoint in front his children, and family, and made several police report to which the police never responded," and that he "was further physically attacked and beaten by two members of the gang because he brought his gay brother in the community."  Morgan also asserted that the IJ erroneously "analyzed the encounter with the police officers only, and not the future torture nor the acquiescence of the Jamaican Government"; that "the IJ did not refer to the record evidence that supportably shows that [Morgan] and his family were issued death threats by the gang and its affiliates"; and that "the IJ failed to assess at least in an express way -- whether the Bushead gang's death threats were threats of imminent death."  None

-24-

of these statements, however, pertain to Morgan's asserted encounter with the Jamaican police.

Morgan did make a passing assertion in his BIA brief that "[t]he police officers threatened to kill [Morgan] if he did not keep paying the Bushead gang," and also quoted at length from his testimony regarding his encounter with the police. But neither of these references appeared in the context of Morgan's developed argument -- beginning on page 16 of his BIA brief -- that the IJ erred in applying an overly narrow definition of torture. Indeed, by stating that "[t]he IJ only considered the single incident between [Morgan] and the police to deny the CAT relief although the record was not depleted of numerous death threats proffered by the gang members," Morgan appeared to train his BIA argument specifically on the IJ's improper classification of threats made by the Gang.

Because Morgan did not tie his definition-of-torture argument to his claim of past torture by the Jamaican police in his counseled brief before the BIA, the argument (as Morgan now synthesizes it) is unexhausted. See 8 U.S.C. § 1252(d)(1); Chun Mendez v. Garland, 96 F.4th 58, 66 (1st Cir. 2024) ("Importantly, 'theories not advanced before the BIA may not be surfaced for the first time in a petition for judicial review of the BIA's final order.'" (quoting Makhoul, 387 F.3d at 80)).

The BIA had no occasion to consider whether the IJ applied an overly narrow definition of torture to the specific facts of the police encounter -- an encounter that, as Morgan described it at the removal hearing, involved different mental and physical harms from those allegedly inflicted by the Gang. We accordingly do not disturb the BIA's determination that Morgan did not carry his burden to establish eligibility for CAT Deferral based on that encounter, even though the BIA did not address the statement of law that Morgan now attributes to the IJ in his petition.

## 2. The IJ and the BIA Applied an Impermissibly Narrow Legal Standard to Morgan's Claim of Police Acquiescence to Past Torture by the Gang.

Morgan next raises a pair of related arguments challenging the IJ and BIA's treatment of his assertion that Jamaican law enforcement acquiesced to torture that he endured at the hands of the Gang. He first argues that "[t]he BIA did not address Petitioner's claim that he suffered past torture by the Bus Head Gang members at the acquiescence of Jamaican officials." He then argues that the IJ applied an improperly narrow definition of acquiescence to torture under the CAT, and that the BIA erred by not addressing the IJ's legal error.

Read together, the opinions of the IJ and the BIA contradict the first of Morgan's arguments. The BIA explained that the IJ "permissibly concluded that [Morgan] and his family

members' testimony about police acquiescence was not supported by objective evidence and therefore was insufficient to demonstrate that the respondent will be tortured with the consent or acquiescence of a public official in Jamaica." The IJ, for her part, stated as follows:

> To the extent the respondent is claiming any torture being committed by the Bus Head Gang, being acquiesced to by the police, the Court does not credit the respondent's claim that the police are being in fact acquiescent, nor does the Court find in the alternative that mere inaction on the part of the police amounts to acquiescence. As stated in the previous section, the Court does not find that the respondent, nor his family members, have objectively reliable and legitimate or reliable information sources of the police operation so as to establish that they are acquiescing to the Bus Head Gang's criminal activities in extorting and physically harming the respondent or his family members. Therefore, the Court is not able to find that any criminal activities that could amount to torture on the respondent are being acquiesced to by any government actor.

To summarize, the IJ squarely addressed Morgan's claim of past acquiescence to torture when she found the evidence for that acquiescence to be unreliable. The BIA then affirmed this underlying credibility finding and concluded that Morgan did not meet his burden to establish eligibility for CAT Deferral.

The second of these arguments, however, has merit: the BIA was silent as to the legal question of the definition of acquiescence, and thus implicitly affirmed the IJ's application of an incorrect definition.

-27-

The IJ assumed that acquiescence requires active cooperation between the police and the direct perpetrators of putative torture. She discounted the notion "that mere inaction on the part of the police amounts to acquiescence," and elsewhere contrasted "the police's relationship with the Bus Head Gangs [sic]" with "the police's lack of action or lack of protection in response to their reporting of the criminal offenses perpetrated by the Bus Head Gang" -- only the former of which, the IJ implied, would support a finding of acquiescence.

Reviewing this implicit legal conclusion de novo, see Varela-Chavarria, 86 F.4th at 449, we conclude that a finding of acquiescence does not require so much. "[A]cquiescence occurs when (1) officials are aware of torture and (2) thereafter breach their legal duty to prevent such activity." Murillo Morocho v. Garland, 80 F.4th 61, 67 (1st Cir. 2023) (cleaned up); see also Khalil v. Garland, 97 F.4th 54, 68 (1st Cir. 2024); 8 C.F.R. § 208.18(a)(7). Under this definition, an act is cognizable as torture under the CAT even where the official directly responsible for it does not actively cooperate with the law enforcement personnel charged with preventing torture. See Murillo Morocho, 80 F.4th at 68-69 (remanding partly because "agency's approach overlooks the possibility that other lower-level government officials . . . still may be acquiescing"); H.H. v. Garland, 52 F.4th 8, 21 (1st Cir. 2022) (expressing "skepticism that any record

-28-

evidence of efforts taken by the foreign government to prevent torture, no matter how minimal, will necessarily be sufficient to preclude the agency from finding that a breach of the duty to intervene is likely to occur").

The government, citing DeCarvalho v. Garland, 18 F.4th 66 (1st Cir. 2021), contends that "the mere inaction on the part of the police in responding to the Bus Head Gang's extortion and intimidation does not amount to the government's acquiescence to torture."  It is true in a general sense that "concerns about how the . . . police will prioritize [a petitioner's] protection and the overall effectiveness of its law enforcement efforts do not compel the conclusion" of the police's acquiescence "to violent acts by [a] criminal organization."  DeCarvalho, 18 F.4th at 75 (emphasis added).  This is because law enforcement's prioritization of matters as a response to resource constraints does not necessarily indicate both "aware[ness] of torture" and "breach [of a] legal duty to prevent such activity."  Murillo Morocho, 80 F.4th at 67 (internal quotation marks and citation omitted).

But Morgan's assertions to the IJ in this case went beyond the concerns at issue in DeCarvalho.  Morgan asserted more than just a pragmatic decision by Jamaican law enforcement to respond to matters other than his.  He stated, for example, that "[t]he police would always refuse to take statements from anybody

or arrest any[] of the [G]ang members." He also stated that police officers did not investigate the assault against him at the supermarket despite stating that they would do so. And because the agency did not perform any analysis whatsoever on whether these assertions of police behavior in this case constituted "acquiescence" in the sense relevant to CAT Deferral, we cannot sustain its resulting conclusion of overall non-acquiescence.[11]

---

[11] We note that Morgan did not point out the legal error he asserts in his petition in his counseled brief before the BIA. His discussion of police acquiescence in that brief challenged only the IJ's underlying credibility determination. Ordinarily, where, as here, Congress "uses mandatory language in an administrative exhaustion provision, a court may not excuse a failure to exhaust." United States v. Palomar-Santiago, 593 U.S. 321, 326 (2021) (internal quotation marks and citation omitted). But here, the government does not raise non-exhaustion as a specific ground for rejecting Morgan's present contention on the definition of acquiescence. The government's brief makes the general point that "[a]s an initial matter, many factual and legal challenges raised in the opening brief were not specifically raised before the Board and have dramatically shifted from the Board brief to now." And the government elsewhere raises non-exhaustion in response to other arguments that Morgan presently advances -- but not to this one. More specificity is generally required: "It is an established appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . ." King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997) (internal quotation marks and citations omitted).

We thus decline to apply the exhaustion requirement here. This is because of the nature of the government's waiver: The government has not asked us to require exhaustion on the specific point of the definition of acquiescence, despite having lodged exactly such a request with respect to other arguments that Morgan did not raise before the BIA.

We accordingly remand to the BIA to reconsider its determination of Morgan's eligibility for CAT Deferral -- that is, of whether Morgan "is more likely than not to be tortured" upon removal -- in light of the correct standard for acquiescence. 8 C.F.R. § 208.17(a). As part of this reconsideration, the BIA may remand to the IJ for further factfinding as to the police's inaction in response to Morgan's asserted claims of mistreatment by the Gang. Cf. Adeyanju v. Garland, 27 F.4th 25, 48-49 (1st Cir. 2022) ("Although it is true that the BIA must remand in those instances where further factfinding on an issue may be required to reach a resolution of the merits, the BIA has the authority to review the undisputed facts in the entire record and, if it finds those facts sufficient to adjudicate the appeal, it may give discretionary weight to those facts and resolve the case . . . ." (citations omitted)).

We next turn to the agency's underlying adverse credibility determination as to the testimony offered by Morgan and his supporting witnesses. This determination was also premised on an erroneously narrow view of the legal standard for acquiescence as a basis for relief under the CAT, and may likewise require reconsideration on remand.

All of the IJ's credibility findings in the CAT Deferral context were tailored to her erroneous view of acquiescence. She stated that Morgan's witnesses did not know of the gang's

"cooperation and close working relationship with the local and regional police"; that the witnesses lacked "any specific personal knowledge of the police cooperation with the Bus Head Gang"); that they lacked "personal knowledge of the police operation . . . or their inability to act on various reports of crimes"); and that they did not have "reliable information sources of the police operation." By contrast, the IJ found that the witnesses had "personal experience with the police's lack of action."

If the agency determines on remand that the police inaction described by Morgan facially meets the legal standard for acquiescence under the CAT, see 8 C.F.R. § 208.18(a)(7), it must accordingly reconsider its determination that the IJ "permissibly concluded that [Morgan] and his family members' testimony about police acquiescence was not supported by objective evidence."

We intimate no view as to the ultimate outcome of the agency's reconsideration of its partial adverse credibility determination. We merely observe that the agency must premise its credibility determination on the correct standard for acquiescence. If on remand the agency again determines that Morgan is ineligible for CAT Deferral, its determination must account for all credible witness testimony that is relevant to this correct standard.[12]

_____

[12] Because we remand for the agency's reconsideration of its

**3. The BIA and IJ Properly Declined to Grant Morgan's CAT Deferral Application on Account of Jamaican Country Conditions.**

Morgan's final argument on the CAT Deferral issue is that the IJ and the BIA improperly discounted record evidence of country conditions in concluding that Morgan would not likely be tortured upon his removal to Jamaica -- and if convicted of the charged offenses, his presumable imprisonment there. See 8 C.F.R. § 208.16(c)(3)(iii), (iv) (requiring the agency to consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and "[o]ther relevant information regarding conditions in the country of removal"). Morgan cites a 2022 U.S. Department of State Human Rights Report, as well as his own removal-hearing testimony that the Gang operates in Jamaican correctional facilities. He argues that we "should vacate the BIA's conclusion [regarding] Petitioner's evidence on the likelihood of torture by Jamaican officials."

Morgan does not specify any legal ground on which the BIA's determination should be vacated. (He later states that the IJ's finding as to country conditions is "incorrect"). Nevertheless, even assuming that incorrectness alone would necessitate remand, Morgan has not made a showing of incorrectness.

_____

determination on past acquiescence, we do not reach Morgan's separate argument that the agency improperly conflated its inquiries into (1) acquiescence to past torture and (2) acquiescence to future torture.

His brief does not engage with the IJ's explanation that "to the extent that the Country Report documents mistreatments or poor prison conditions in Jamaica, they do not rise to torture in this case, as unless those conditions are maintained and created specifically for the commission of torture, they are not sufficient to support the respondent's eligibility for protection under the Convention against Torture." This explanation passes muster: "general evidence about country conditions," we have explained, "cannot compensate for the lack of specific evidence showing a particularized risk of torture." Bazile v. Garland, 76 F.4th 5, 16 (1st Cir. 2023) (first citing Alvizures-Gomes v. Lynch, 830 F.3d 49, 55 (1st Cir. 2016); and then citing Mendez-Barrera v. Holder, 602 F.3d 21, 28 (1st Cir. 2010)). And "any reasonable adjudicator," with respect to the agency's application of that principle here, would not "be compelled to conclude to the contrary." Barnica-Lopez, 59 F.4th at 527 (internal quotation marks and citation omitted); see also Samayoa Cabrera v. Barr, 939 F.3d 379, 383 (1st Cir. 2019) ("Samayoa would have had to demonstrate to the BIA that the IJ had erred in rejecting his contention that he was particularly likely to be tortured because he would be targeted for harsher treatment than other prisoners in consequence of who he was.").

**IV.**

For the foregoing reasons, we **deny** the petition for review insofar as it challenges the agency's determination of Morgan's ineligibility for asylum, Statutory Withholding, and CAT Withholding. We **grant** the petition for review insofar as it challenges the agency's determination of Morgan's ineligibility for CAT Deferral, **vacate** that determination, and **remand** to the BIA for further proceedings consistent with this opinion.